MARY CRAIG, executrix, *vs.* NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.

Hampden. September 28. — 29, 1875. AMES & DEVENS, JJ., absent.

In an action against a railroad corporation to recover for injuries occasioned by an engine coming into collision, at a highway crossing, with a wagon in which the plaintiff was driving at about half-past five in the morning, in December, it appeared that there were six tracks across the highway; that the plaintiff was pre-

vented by the buildings on either side of the highway from seeing the approaching engine until he had driven on to the first track; that he then saw the engine on the further track; that the place was one across and near which engines and cars of all kinds were constantly moving; that the gates, which were arranged to swing across the highway when a train was passing, and across the railroad when the highway was safe for travel, were in the night time swung back so as to leave both the highway and the railroad open; that there was no flag or lantern at the crossing as had been usual when an engine or train of cars was about to pass while the gates were not so shut; that the plaintiff's horse was gentle; that the plaintiff did not, on seeing the engine, stop or whip up his horse, which was walking; and that he thought he could have stopped the horse on seeing the engine, if he had tried. *Held*, that the question whether the plaintiff was in the exercise of due care was for the jury.

TORT for an injury occasioned to Joseph Craig, the plaintiff's testator, by a train of the defendant coming into collision with a wagon, in which he was driving, at a crossing of the railroad and a highway in Springfield. Trial in the Superior Court before *Brigham*, C. J., who allowed a bill of exceptions in substance as follows :

The jury took a view of the premises, and the plaintiff contended that the view disclosed to them that the railroad runs north and south through Springfield, crossing Bridge Street near the centre of the city, which street runs east and west; that the end of a freight house comes within a few feet of the north line of the street; that the crossing is a grade crossing such as is described and referred to in the St. of 1871, *c.* 352 ; that in passing along Bridge Street from the east to the west, (as was the deceased in this case,) the tracks of the defendant road are concealed from the view of the traveller upon Bridge Street, and that such traveller cannot see whether trains or engines are approaching from either direction, by reason of such concealments of the tracks by the depot buildings and freight cars of the defendant road, until he gets upon the tracks at the crossing, to the place where the deceased testified he was when he first saw the approaching train ; that Bridge Street was a great thoroughfare, the only highway leading across the Connecticut River westward from Springfield ; that the crossing is forty-six feet wide east and west, and the street forty-four feet wide ; that six tracks cross the street, but that upon the north side of the street, from twelve to twenty tracks are laid, all connected by switches with the tracks that cross the street in such manner that a person

upon any of the tracks of the street at the time of day the injury was received in this case, could not tell which track an approaching engine would take in passing over Bridge Street.

The defendant contended that the view disclosed a very different state of facts from that claimed by the plaintiff, but the judge stated that he should make the ruling in view of the claim made by the plaintiff, as to what the view disclosed.

The engine which caused the injury was attached to a regular passenger train going southward, and was upon the west track, which was the regular track for down trains.

The plaintiff put in the deposition of Joseph Craig, the deceased, which was made part of the bill of exceptions, and the material parts of which were as follows : " Between five and six o'clock in the morning of December 22, 1873, I was going to Mittineague with a one horse wagon and a load of meat. There was a wagon ahead of me, and as I got on the first track of the railroad crossing I just saw the engine coming then ; so he hurried up, and I thought I could cross too. He got past, and I got caught. Just as the other man got upon the track where the train was coming, a man came out of the lobby with a lantern. There was nobody that I could see in charge of the gates at the crossing, just before the accident; the gates were open, and everything was clear when I started to cross. When I first saw the engine approaching, I was on the first track, that is the track next to Water Street, the horse was on the other one. I first started to look for the cars when I got to Water Street. I saw everything clear then. When I got to the first track, I think there was a freight train standing at the depot, on the first track. I had no knowledge or warning of the coming cars, until I saw them. The reason I crossed was that I saw the gates closed on the opposite side, and I thought the engine was not coming so far. If the gates had been opened, I should not have undertaken to cross. In the first part, when I stated the gates were open, I mean the gates were open on the street, and shut across the track. I meant in the last sentence, the gates were open on the street, and shut across the tracks. I was struck by an engine. I can't say whether there was a car hitched to it or not. It was pretty dark at the time. I saw no person at or about the crossing before the man came out of the lobby with the lantern. I was on the first

track when he came out. He made no signal and gave no warning, that I saw. He only ran toward the engine when he came out, and I was struck by the time he got there. The lobby from which he came was on the east side of the track, on the side of Bridge Street near the freight house. When I first saw the engine, I could not have stopped in time to have prevented the accident, for the horse was in front of it, and he was anxious to get away. I was not conscious immediately after being struck. It was most two days afterwards before I could recollect anything."

*Cross-examined.* — " My horse was walking when I first saw the engine. The engine was close by when I first saw it. It was on the west track, while I was on the east. It was right on the crossing when I first saw it. The horse in front of me was walking. I did not start my horse into a trot before I was struck. He continued walking up to the very time he was struck. When I saw the engine I made no effort to stop my horse, because I thought I could get across easy enough, and safe. If I had not thought I could get across safely, I think I could have stopped my horse. I suppose I could have stopped my horse on seeing the engine if I had tried. I was close to the team ahead of me, and directly behind it. The lobby I have spoken of is the watchman's little house close by the sidewalk on Bridge Street, and just east of the railroad tracks. The man who came out of the lobby with the lantern came right to the engine just as I was struck. When I first saw him he was coming out of the lobby. I was on the first track when I first saw him. I did not turn around. I saw the light of the lantern coming up from behind from the lobby. The engine was on the same side. The man came running towards the engine; before he got there it struck me. I saw the engine before I saw the man with the lantern. Immediately before going on to the first track I looked up the railroad northward towards the depot to see if any engine was coming. I could not then see the engine because the freight car was in the way. I had crossed the railroad four or five times before at this hour."

The plaintiff also called witnesses who testified that the deceased was driving a one-horse wagon, with a load of one thousand pounds of meat; that he had a fine spirited horse, gentle

and safe, not much afraid of engines, but that he would not stand close to an engine passing him; that "you could not stop him close to an engine and have him stay there;" that they were present when the deceased gave his deposition; that he was weak and low; that his mind was perfectly clear; and that he became weari ed in the giving his deposition; and that pauses were made to give him rest and refreshment.

The plaintiff also called Richard McGee, who testified that he preceded the deceased in passing the railroad tracks; that he heard no whistle and no bell; that the gates were open across the street permitting passage of wagons; that there was no watchman, flagman, or other person to give any warning, and nothing to indicate but that the passage across the railroad was free and safe; that he could and did see nothing of any train or engine till he got upon the tracks, when he saw the engine coming down upon him; that at that time he was walking his horse; that he shook the reins upon the horse, which was a very fast animal, and got across the track and into the bridge when he heard the crash of the collision with the deceased; that when he went upon the crossing, he heard the rumbling of a wagon right behind him, but did not see who it was; that he looked up before entering upon the tracks, but saw no train; that he could not see up the track by reason of the buildings of the defendant. He testified on cross-examination, that he was in the second small arch of the bridge when he heard the crash of the collision, and that he thought the engine was up by the car house when he first saw it coming; and that it was coming pretty sharp. It appeared afterward that it was two hundred and ninety-one feet from the crossing to the south end of the car house, and four hundred and ninety-three feet to the north end of the same.

It was testified by one Beach, a witness for the defendant, that the established precautions of the defendant at this crossing were two gates, that were swung across the street during the passage of trains, and when the street was safe for travel these gates were open upon the highway, and were swung across the tracks of the railroad; that these gates were thus operated from 7 A. M. to 6 P. M.; but that during the night the gates were thrown back and locked to posts upon the side of the railroad, leaving both the street and railroad unobstructed; that while the

gates were thus unused, a man was kept upon the street all night and an extra one put on with him at 4 A. M. with lanterns, whose sole business was to warn travellers whenever an engine or cars should be passing over the crossing; that the switch engine began work regularly at 4 A. M., and worked busily until the freight train was made up at 5.40 A. M.; that it switched frequently across the street and upon each side of it, sometimes crossing the street and at others coming toward the street and stopping before reaching it; that it had done so a few minutes before the accident, and had then gone back into the yard to the north of the crossing; that the yard extended down to the street and to some extent included the street, and to the south of it. There was also evidence that freight trains stood in the yard above the street, and that the accident occurred between 5.25 and 5.30 A. M. One Babb, a witness called by the defendant, testified that he was the fireman on the defendant's engine that came in collision with the deceased; that he first saw the deceased on the track a few feet from him, and that he was then upon a smart trot.

The defendant introduced evidence tending to contradict the plaintiff's evidence, and to show that the plaintiff was not in the exercise of due care, and that the defendant was not negligent. The judge ruled that, upon the whole evidence, the jury would not be authorized in finding that the deceased was in the exercise of due and reasonable care, and for that cause directed a verdict for the defendant; and to this ruling the plaintiff alleged exceptions.

*M. P. Knowlton*, for the plaintiff.

*N. A. Leonard*, for the defendant. The deposition of Craig shows that he was familiar with the crossing at the hour in the morning that the accident happened; that he saw the train coming when he first got upon the east track; that he knew the engine was on the west track, when he was on the east track; that he saw McGee, who was ahead of him, hastening to avoid the train; that he ventured the attempt to cross voluntarily, and without urging his horse out of a walk. The deposition does not show that the horse was unmanageable, but that he continued walking up to the time he was struck; or that Craig made any effort to control his movements; or that he himself was frightened, or thought himself in danger when he saw the approaching train, or supposed it would leave the west track on which it was

coming, or had any thought about his safety, excepting that the train might stop, or he could get across easy enough and safe. If Craig had stopped his horse on the east track when he saw the train coming, or had hurried across, he would have probably escaped the accident by which he was hurt. He made no effort to do either, but walked his horse across four tracks, and a distance of thirty-six feet, up to the instant he was struck by the engine. The only inference to be drawn from all the evidence in the case is that the deceased voluntarily, and with the knowledge that he was running some risk, attempted to cross a railroad track in front of an advancing train, because he thought he could do it with safety. The jury had no right to infer from the view a condition of things contrary to the statement of Craig, and the judge properly directed a verdict to be rendered for the defendant. *Gahagan* v. *Boston & Lowell Railroad*, 1 Allen, 187. *Mayo* v. *Boston & Maine Railroad*, 104 Mass. 137, and cases cited. *Allyn* v. *Boston & Albany Railroad*, 105 Mass. 77, and cases cited. *Wilds* v. *Hudson River Railroad*, 29 N. Y. 315.

GRAY, C. J. There was evidence that the deceased was prevented by the buildings on either side of the highway from seeing the approaching engine until he had driven upon the railroad track ; that the place was one across and near which engines and cars of all kinds were constantly moving ; and that the gates were not shut across the highway, and there was no flag or lantern at the crossing, as had been usual when an engine or train of cars was about to pass while the gates were not so shut. There was nothing to show that he neglected any precaution before reaching the crossing, or had any reason to think that the engine which he saw approaching was attached to a passenger train or moving at great speed ; and the question whether he was negligent in proceeding in the manner he did, instead of stopping his horse, or turning about and driving back, was a question of fact for the jury. *Exceptions sustained.*