SETH HINCKLEY, administrator, *vs.* CAPE COD RAILROAD COMPANY.

Bristol. Oct. 28, 1873. Oct. 26, 1875. — May 22, 1876. LORD, J., absent.

In an action against a railroad corporation, by the administrator of a person so injured by being struck by a car, while crossing the railroad, that he died almost immediately, there was evidence that the railroad, running north and south, crossed a highway at grade near the railroad station ; that, a short distance north of the highway, a side track branched off and crossed the highway a little easterly of the main track, and led into but not through the station ; that the station was south of the highway; that the pathway, used by persons going to the station from the highway on the east side, crossed the side track oblique'y, the distance to the plat-

form being one hundred and fifty-seven feet; that at the point where the path left the highway one could see up the track to the north for about one hundred and fifty feet, and from the track itself for half a mile; that the person injured was going to the station to see his daughter off by a train which was then due; that the ground was frozen and slippery; that, as he approached the railroad from the east, a freight train was coming from the north, which kept upon the main track, except a single car, which was switched upon the side track; that, as he was cross-ing the side track by the usual path, he was struck by the detached car, which was moving rapidly, and without any signal or warning. *Held,* that, on this evidence, the jury would not be warranted in finding that the plaintiff's intestate was in the exercise of due care. GRAY, C. J., and MORTON, J., dissenting.

TORT for an injury occasioned to Philip Hinckley, the plain-tiff's intestate, by being struck by a car of the defendant.

Trial in this court, before *Colt*, J., who, at the close of the plaintiff's evidence, reported the case to the full court upon the question whether it would be competent for the jury to find that the intestate was in the exercise of due care. If so, the case was to stand for trial; otherwise, the plaintiff to become nonsuit.

Annexed to the report was a plan, a copy of so much of which as is material appears in the margin.*

*       A, B, C, D, switches.
        E, Murphy's Corner.
        A to B, 41 ft.
        C to D, 98 ft.
        D to Depot, 126 ft.
        E to Platform, 157 ft.

The evidence reported was in substance as follows:

Seth Hinckley testified: "Philip Hinckley, my father, was sixty-eight years old, and was a watchman for the Boston & Sandwich Glass Co. I have lived in Sandwich nearly thirty years, and was born there; am familiar with the premises round the depot there ever since it was built, ten to twenty years ago. For many years the Church Street and East Jarvis Street travel has turned round Murphy's Corner; passed a few paces between the fence and the nearest track by a worn pathway, and then crossed over diagonally, varying a little to the depot platform, crossing the sidings; never knew much change in travel before the accident, except that occasionally people would cross Jarvis Street planking. Most of Sandwich lies west of the track. Father went every day to the passenger trains, had business with the passenger trains, but had no business with the freight trains. From Murphy's Corner we can see north up the track one hundred and fifty feet; a slight curve comes there; can't see to Town Neck, except by going to the track; when there, you can see up to Town Neck, which is half a mile off northerly. There is quite a village east of the railroad, which uses Jarvis Street and Church Street thus; also, five hundred people there employed in the Glass Works; there was never any fence across the regular path of which I have spoken."

James Parks testified: "I live on the north side of Jarvis Street, thirty-five feet from the railroad, and knew Philip Hinckley forty-two years. I was with him fifteen minutes before the event at Hobson's store. I saw him and his daughter go by my house to the railroad; she was about two rods ahead of him then; people that go by my place to go to the platform go in the same direction Mr. Hinckley did; all that part of the town go that way. I next saw him dead. I was in my house, and heard no bell, and couldn't see train; heard rumbling. Have known the premises since the railroad was built; the travel goes there between the switches. When I got there, I saw one of his eyes open, and that he was alive. No flagman was ever at that crossing. I can't say whether the up passenger train from Barnstable was in or not. The siding north of Keenan's is within a few feet of the Cape Cod Glass Works. It was a pretty cold day, and the ground frozen and slippery. It rained the night before.

It was the day after Thanksgiving. The wind was northwest. When Mr. Hinckley passed my house, he was heading straight for the railroad. When he passed my house, I got up and looked to see him run, him and his daughter. The freight train is due about 3 o'clock, but is not regular, and arrives from 2 to 5."

Clarissa Chase testified : " Philip Hinckley was my father; I was going to Boston on the day of his death, on the 3 o'clock train. I had my child with me, seven months old, and father was accompanying me to see me safe off in the train. It was the day after Thanksgiving, and very slippery; some snow, and blowing very hard. As I was going to the station, baby's hat blew off near Murphy's Corner; I turned to pick it up, and turned round again and saw my father killed; did n't see the car ; gave my baby to a man and went to him; I heard no bell, nor whistle, and saw no engine or cars, just before my child's cap blew off, or at any time that afternoon. It was about 3 o'clock. People going down Jarvis Street to the platform go just where my father did; you come down Jarvis Street and go across be-tween the switches across the same place where my father was killed. My little girl aged twelve was with me. I saw father try to rise up and then fall over on his side, and try to pick up his hat with his left hand. There was no flagman. My father told me when we started that the train had come. I had not crossed any track when he was killed ; he had got ahead of me, passed me when I was picking up baby's hat. The car must have gone by me, but I did not see it. Father had not left me at the depot and turned to go home."

Thomas Montague testified : " I have lived in Sandwich more than twenty years. I was in the base-ball club-room and heard a whistle; I thought that it was the 3 o'clock train that was coming. I ran out and saw Basset throw up his hands, and saw Hinckley lying; the car was then half way between the switch and depot. He tried to speak, but I couldn't make out the words. When I heard the whistle I thought it was the 3 o'clock train ; there is no way in which a carriage can come to the depot platform without crossing a track. The base-ball club-room is four or five buildings from the main track on the north side of Jarvis Street."

John B. Basset testified : " Have lived in Sandwich twenty years. I saw Philip Hinckley in Hobson's store ; I came out of it and started to go to the depot, to see the 3 o'clock train from the Cape. I went through Jarvis Street ; went between the tracks. The engine went down on the main track south ; I saw the box car coming ; saw Hinckley crossing the track ; called to him, but the wind was blowing, and I don't think he heard me. I stooped down and saw the car go over him. I was fifteen or twenty feet from him ; wind northwest, pretty hard, blowing down the railroad. Hobson's store is one hundred yards from Keenan's. I stopped five minutes at Murphy's Corner, when the engine passed, I can't say if with or without cars ; I saw the car coming ; a clear view up to Town Neck ; Mr. Hinckley was ahead of Mrs. Chase, and when he started to cross the tracks I was between the siding and the main track that runs into the depot ; the car was between us ; he was between the switches, north of the second switch from Jarvis Street ; when it struck him it threw him forward. I heard the brakeman in the car hallooing, and turned round ; saw the car hit him in the back."

Thomas Bower testified : " I was on the west side of the railroad, between Jarvis Street and the platform ; saw Mr. Hinckley as he was crossing ; the car was going very fast, and the wind fresh from the north ; the brakeman was on the north end of the car ; I don't remember any engine passing down ; I was watching the car coming in ; it was coming quite fast ; it went into the depot without stopping ; no engine was with it."

There was other evidence tending to show that no bell or whistle was heard, and that Philip Hinckley lived some minutes after he was struck by the car.

The case was argued in October, 1873, and reargued in October, 1875.

*T. M. Stetson,* for the plaintiff.

*G. Marston & C. W. Clifford,* for the defendant.

DEVENS, J. Upon the evidence it might fairly have been found by the jury that the defendant was guilty of negligence in permitting its car, by collision with which the injury was occasioned, to traverse the track at a high rate of speed and without proper warning, but mere proof that the negligence of the defendant was a cause adequate to have produced the injury will

not enable a plaintiff to recover, as it does not necessarily give rise to the inference of due care upon his part, proof of which is essential to his case. It may still be that he was not exercising it, and the injury thus have resulted from the concurring negligence of both parties. *Murphy* v. *Deane*, 101 Mass. 455, 463. While one may, in the exercise of reasonable care, rely to a certain extent upon the performance of his duty by the other, no negligence of such other can be so dominant as to relieve him from his own obligation, and, if a performance of such obligation might have prevented the injury, his failure so to perform must be considered as contributing thereto.

While, however, the plaintiff is to show that he was in the exercise of due care and that no negligence of his contributed to the injury, this may be shown by proving facts and circumstances from which it may fairly be inferred, and, if all the circumstances under which an accident took place are put in evidence, and upon an examination of them nothing is found in the conduct of the plaintiff to which negligence can fairly be imputed, the mere absence of fault may justify the jury in finding due care on his part. *Mayo* v. *Boston & Maine Railroad*, 104 Mass. 137. But, if there is only a partial disclosure of the facts, and no evidence is offered showing the conduct of the party injured in regard to matters specially requiring care on his part, the data for such an inference are not sufficient. It can only be warranted when circumstances are shown which fairly indicate care or exclude the idea of negligence on his part. *Crafts* v. *Boston*, 109 Mass. 519.

If there were no evidence that Hinckley had been seen by any one from the time he started from his house until he was found lying on the ground, having been knocked down by the car, it could hardly be contended that there was any evidence of due care on his part. Yet such a case does not differ substantially from that presented by the plaintiff. It was shown that Hinckley, as he approached Murphy's Corner, was in a position to command a view of the railway track for about one hundred and fifty feet, and that as he reached the track it could have been seen for the distance of a half mile to the Town Neck; that Basset, who preceded him, and who crossed the track some fifteen or twenty feet before him, stopped at Murphy's Corner, and

when there saw the engine and saw the car coming which was detached from the train drawn by it, which car subsequently struck Hinckley. It does not appear, however, that Hinckley, either at Murphy's Corner, at any intermediate point, or when near the track and about to cross, exercised the precaution of looking to see whether anything was approaching, nor were any circumstances shown which would justify him in neglecting the usual and necessary precautions of those who are about to cross a railroad track upon which a train might be approaching. There is an utter absence of evidence as to what Hinckley did from the time his conduct became a matter of importance until his injury, and it is impossible to infer from that offered that he exercised the care and circumspection properly to be demanded from one in his situation.

The cases most relied on by the plaintiff may, we think, be distinguished from this. In *Craig* v. *New York & New Haven Railroad*, 118 Mass. 431, there was evidence that the buildings on either side of the highway prevented the person injured from seeing any engine which might be approaching until he had actually driven upon the railroad track. It had been usual to shut the gates across the highway, or to place a flag or lantern at the crossing, when an engine or train was approaching, and neither of these things had been done. The plaintiff's intestate, who necessarily relied upon the signals made by the defendant, had, therefore, neglected no precaution in entering upon the railroad track. When thus upon it, it was properly held a question of fact for the jury whether he was negligent in proceeding in the manner that he did instead of stopping or turning back. In *French* v. *Taunton Branch Railroad*, 116 Mass. 537, the circumstances under which the plaintiff crossed the track were fully developed. While she could have seen the track at two points a short distance from the crossing, she did not there look; but it was in evidence that she was driving carefully, that she saw a train of cars pass just before reaching the crossing, but saw no flagman and received no warning not to cross, and that she was induced to cross by her belief that one train would not follow another so closely. Having been struck by a car which had been separated from the train for the purpose of making a running switch, it was a question of fact for the jury whether a sufficient

inducement to cross had been given to her by the previous passage of the train and the absence of any warning not to cross, and thus whether she was in the exercise of due care or whether she was careless in having failed to look up the track at the points near the crossing where it was visible. In *Williams* v. *Grealy*, 112 Mass. 79, it was held that it could not be determined that there was error in refusing to rule that a foot passenger, who was injured by a runaway horse at a street crossing, was not in the exercise of due care from the mere fact that she did not look, as she crossed, to see if anything was coming, when it appeared that at the trial there was other evidence, which bore upon the question of due care, which was not reported.

Here the whole of the plaintiff's case is before us. It presents but a partial disclosure of the facts attending the injury. It is shown that Hinckley was struck by the car of the defendant, but the circumstances under which he was thus struck or under which he entered upon the defendant's track are not developed, and there is nothing in the evidence which tends to show due care or the want of it on his part. That there should be some evidence of such care is essential to the plaintiff's case.

For these reasons, a majority of the court is of opinion that the plaintiff cannot maintain his action.

GRAY, C. J. With the greatest deference to the opinion of our brethren, Mr. Justice Morton and myself are unable to escape the conclusion that their judgment is inconsistent with previous decisions of this court and invades the province of the jury, and we therefore feel bound to state, as briefly as may be, the reasons of our dissent.

The only question reserved by the report is whether the jury would be warranted in finding for the plaintiff upon the question of due care on the part of his intestate.

It appears to us that the evidence introduced at the trial would warrant a jury in finding that the intestate was walking on a level path across the defendant's station grounds, by which he and other passengers had been accustomed daily for a long time, with the defendant's knowledge, to approach the station, and which had been left open by the defendant to enable and invite passengers and persons reasonably accompanying them to do so that the defendant had provided no way of access to its station

in any direction without crossing one or more tracks; that the intestate was accompanying his daughter "to see her safe off on the train," which was then due; that the ground was frozen and slippery, and the wind blowing hard; that he was struck by a car of the defendant, detached from the engine (which passed down the main track) and coming, without any warning, upon a side track (which led into, but not through, the station) at a rate of speed, which one of the witnesses described as "very fast," and which the intestate had no reason to anticipate upon such a track, and at a time and place at which the defendant would be bound to contemplate that passengers and those lawfully accompanying them would probably be approaching the station in accordance with the defendant's implied invitation; and that the intestate was walking towards the platform in a direct line, and so quickly that the approaching car would not strike him, and would not, if he saw it, be supposed by him to be in danger of striking him, if it had not been moving at an improper rate of speed.

In our judgment, the case is not distinguishable in its facts, or in the rule which should govern it, from those of *French* v. *Taunton Branch Railroad*, 116 Mass. 537, and *Craig* v. *New York & New Haven Railroad*, 118 Mass. 431; and nothing was shown, in either of those cases, which a jury might not properly infer from the evidence in this case, applying to it their knowledge of the habits of thought and mind and the natural instincts of men.

The case appears to us to fall within the general rule stated in *Gaynor* v. *Old Colony & Newport Railway*, 100 Mass. 208, 212, that "ordinarily" the question whether the plaintiff has proved due care on his own part "is to be settled as a question of fact in each case, as it arises upon a consideration of all the circumstances disclosed, in connection with the ordinary conduct and motives of men, applying as the measure of ordinary care the rule that it must be such care as men of common prudence usually exercise in positions of like exposure and danger. When the circumstances under which the plaintiff acts are complicated, and the general knowledge and experience of men do not at once condemn his conduct as careless, it is plainly to be submitted to the jury. What is ordinary care in such cases, even though the

facts are undisputed, is peculiarly a question of fact to be letermined by the jury under proper instructions. It is the judgment and experience of the jury, and not of the judge, which is to be appealed to."

The degree of care required of a passenger, or a person lawfully accompanying him, approaching or leaving the station of a railroad corporation by the usual course, is not always the same as at a common crossing of a highway by a railroad. In the case just referred to, it was said by the court that "without doubt, if the situation and aspect of the place were such that, in connection with the actual use, the jury would be justified in regarding them as holding it out to the plaintiff as a suitable place for him, on leaving the cars, to cross, and he was thereby induced to attempt it, the measure of care required of him would be satisfied with far less vigilance and caution." 100 Mass. 214. See also *Chaffee* v. *Boston & Lowell Railroad*, 104 Mass. 108, 115; *Mayo* v. *Boston & Maine Railroad*, 104 Mass. 137, 142; *Wheelock* v. *Boston & Albany Railroad*, 105 Mass. 203; *Prentiss* v. *Boston*, 112 Mass. 43, 47; *Williams* v. *Grealy*, 112 Mass. 79, 82.

For these reasons, we are of opinion that the case should stand for trial; but as a majority of the court is of a different opinion, there must be a                                     *Nonsuit.*