CATHERINE MAGUIRE, administratrix, *vs.* FITCHBURG RAILROAD COMPANY.

Suffolk. January 17, 1888. — March 5, 1888.

Present : MORTON, C. J., DEVENS, HOLMES, & KNOWLTON, JJ.

*Railroad — Loss of Life — Negligence — Due Care — Evidence.*

A laborer employed in a grain elevator, while assisting in unloading a railroad car, the brakes of which were set, was killed by other cars coming violently against it and forcing it from its position. In an action against the railroad, under the Pub. Sts. c. 112, § 212, it appeared that the car stood upon a single track, and filled, with the exception of eight inches, all the space between a platform and the side wall of the building; that the grain was being shovelled into hoppers under this platform; that it had been a part of the laborer's duty to sweep the loose grain falling on or near the track into the hoppers; that just before the accident, being dismissed from another part of the work, he took a broom and

disappeared; and that after the accident he was found dead near the track with the broom. *Held,* that the jury might infer that he was in the exercise of due care when the accident occurred. *Held, also,* that evidence of his sweeping loose grain into the hoppers on former occasions was admissible to show the character of his employment.

TORT by the administratrix of the estate of Daniel Maguire, for causing his death in the elevator of the Hoosac Tunnel Dock and Elevator Company, in Charlestown. Trial in the Superior Court, before *Bacon, J.,* who, after admitting certain evidence against the objection of the defendant, ruled, at its request, that there was no evidence that the intestate was in the exercise of due care at the time he was killed, and that the plaintiff could not recover, ordered a verdict for the defendant, and reported the case for the determination of this court. If the ruling was correct, or if the evidence was improperly admitted, judgment was to be entered upon the verdict; otherwise, a new trial was to be granted. The facts and evidence appear in the opinion.

*H. W. Bragg* and *J. A. Maxwell,* for the plaintiff.

*G. A. Torrey,* for the defendant, cited *Mayo* v. *Boston & Maine Railroad,* 104 Mass. 137; *Crafts* v. *Boston,* 109 Mass. 519; *Hinckley* v. *Cape Cod Railroad,* 120 Mass. 257; *French* v. *Taunton Branch Railroad,* 116 Mass. 537; *Corcoran* v. *Boston & Albany Railroad,* 133 Mass. 507; *Riley* v. *Connecticut River Railroad,* 135 Mass. 292; *Blanchette* v. *Border City Manufacturing Co.* 143 Mass. 21; *Indiana, Bloomington & Western Railway* v. *Greene,* 106 Ind. 279; *Sorenson* v. *Menasha Paper Co.* 56 Wis. 338; *Wakelin* v. *London and South Western Railway,* 12 App. Cas. 41; *Chase* v. *Maine Central Railroad,* 77 Maine, 63; *State* v. *Maine Central Railroad,* 76 Maine, 357; *Starry* v. *Dubuque & S. W. Railroad,* 51 Iowa, 419; *State* v. *Philadelphia, Wilmington, & Baltimore Railroad,* 60 Md. 555; *State* v. *Baltimore & Ohio Railroad,* 58 Md. 221; *Curran* v. *Warren Chemical Co.* 36 N. Y. 153; *Cordell* v. *New York Central & Hudson River Railroad,* 75 N. Y. 330; *The Gladiolus,* 21 Fed. 417.

DEVENS, J. The only question presented by the case is whether any evidence was offered from which due and ordinary care could be inferred on the part of the plaintiff's intestate when the injury to him occurred. He was not the servant of the defendant, but of the Elevator Company, employed to per-

form such duties as might be assigned to him, and " to make himself generally useful." As the evidence tended to show, he was engaged in the elevator building in assisting to unload grain from two cars, which had been brought in by the defendant, the brakes of which had been set and the cars thus rendered stationary. The defendant negligently, and without reasonable warning, while this operation was being performed, sent certain other cars into the building against the stationary cars with such violence as to force them a considerable distance from their position. Immediately afterwards the plaintiff's intestate was found dead, lying across one rail of the track. The track upon which the stationary cars thus being discharged stood was a single one, laid down between a platform (covering hoppers into which the grain was shovelled from the cars) and the brick wall on the other side of the building. The cars occupied the whole space between this platform and the wall, except about eight inches on either side. During the operation of unloading, it was common for grain to fall from the cars outside the hoppers, and upon or near the track, and grain had so fallen at this time. It was the custom to sweep the grain which had thus fallen into the hoppers. It was a part of Maguire's duty, with that of the other men, to do this, and at other times he had been thus engaged.

A few minutes before the accident, he had been seen standing on the platform, attending to the regulation of feed from the hopper to the elevator belt, by which the grain was raised to the bins in the upper story, which was done by means of a small wheel regulated by hand. The assistant to the second foreman testified that he had " told him that would be enough, to leave it," and did not know where Maguire then went to. " I went to the other hopper," the witness continued, " and heard my second foreman sing out, and the cars came then just as quick as anything; the men did not get time to let go of anything when the noise was made." The assistant foreman testified : " When the cars came in, I was standing on the platform, right at the door of the car where the men were working. I did not see Maguire at that particular time. I was talking with him about two minutes before that. I don't know where he went; he had a broom in his hand; he disappeared, and I don't know

where he went." There was therefore evidence that, after having been dismissed at the wheel, he had taken his broom for the purpose of using it, and had used it on the platform. At the precise time of the accident he was seen by no one, and when he "disappeared," as stated by the assistant foreman, it was not shown that he had stepped down on to the track, but he was there found with his broom when the accident was over.

While due care must be shown by a plaintiff in order that it may be seen that an injury to him was not occasioned by any contributory negligence on his part, it is not necessary that any positive act of care shall be proved. It may be inferred from mere absence of fault, when sufficient circumstances are shown fairly to exclude the idea of negligence on his part. If a person is in the place where he may rightfully be engaged in duties which he may properly there perform, under circumstances which do not require the exercise of especial caution on his part against the acts or the negligence of others, he is in the exercise of due care. A passenger sitting quietly in his seat in a railroad car is, so far as relates to the management of the train, in the exercise of due care. When laborers are set to work upon a railroad track upon the assurance, express or implied, that the use of such track is suspended, they are not guilty of negligence if they continue their work without constantly watching for coming trains.

In the case at bar the cars were in a building not belonging to the defendant, and were fixed there for the purpose of being unloaded. The laborers had a right to conduct that work as it was usually done, without watching constantly lest a train should suddenly be driven in, and upon the assumption that proper notice would be given of an incoming train. If after the collision the body of one of the men standing upon the cars and engaged in shovelling the grain had been found upon the ground, as if thrown down, there would have been sufficient evidence of due care from his employment when the collision took place.

The presence of the deceased on the track with his broom, as shown by the discovery of his body there, affords evidence that he was there for the purpose of sweeping. Whether he had actually begun or not is not important, if he was there for the

purpose of commencing as soon as practicable. He had been dismissed elsewhere, and the sweeping the track was in the line of his duty. He was not bound any more than the shovellers to watch for approaching trains, but had a right to believe that the laborers upon the cars, or engaged in removing the loose grain, would not be disturbed without proper notice. The jury might well have believed that he was on the track in the performance of his duty, and in the exercise of all the care to be expected of a prudent man. If rightfully in the place of danger, it is not contended that he had any opportunity to escape.

The case is quite distinguishable from those cases where it has been held that the disclosure of the facts has been so limited that there could be no fair inference that a plaintiff was in the exercise of due care, or that the evidence was equally consistent with care or negligence on his part. If the only negligence of which deceased could have been guilty must have been that he was on the track with no rightful purpose, or under such circumstances that a prudent man would not have been there, and if the evidence and the inferences to be drawn from it tend to show affirmatively otherwise, the issue of due care may be sustained.

Without undertaking to examine in detail the numerous cases cited by the defendant, that upon which it principally relies is *Hinckley* v. *Cape Cod Railroad*, 120 Mass. 257. But that case does not sustain the defendant's contention. It was one where evidence was necessary in order to show what was the conduct of the party injured in regard to circumstances especially requiring care on his part. Without this it could not be determined whether he was or was not in the exercise of due care, and no such evidence was offered. It was said not to differ substantially from a case where the party injured might have been found lying on the ground, having been knocked down by a passing car on the railroad track, there being no evidence as to what his own conduct had been. Hinckley, who attempted to cross a side railway track in order to reach the station on the other side, as he approached a place known as Murphy's Corner, on his way thus to cross, had a view of the railway track for one hundred and fifty feet, and as he reached the track it could have been seen by him for the distance of half a mile. One Basset, who

was some fifteen or twenty feet behind him, stopped at Murphy's Corner, and saw the car which subsequently struck Hinckley detached from the train on the main line. He called to Hinckley, but was probably not heard on account of the wind. It did not appear that Hinckley, either at Murphy's Corner, at any intermediate point, or when near the track and about to cross, exercised the precaution of looking to see whether anything was approaching. No circumstances were shown which would justify him in neglecting the usual and necessary precautions of those who are about to cross a railroad track upon which a train or a car might be approaching. In the utter absence of evidence as to what Hinckley did after the time when his conduct became a matter of importance, it was impossible to infer that he had exercised the care and circumspection properly to be demanded of him.

The case at bar differs from that class of cases in which it is necessary to show some positive act on the part of the plaintiff in order to prove that he was in the exercise of due care. The plaintiff's intestate had a right to believe, if engaged in any labor connected immediately with unloading the cars, that he would not be interfered with by a reckless incursion of the trains of the defendant. We are therefore of opinion that the inquiry whether the plaintiff's intestate was in the exercise of due care should have been submitted to the jury.

The evidence objected to by the defendant and received by the learned judge, that at other times the deceased had swept up the loose grain, was competent as showing the character of his employment.                    *New trial ordered.*