### BRIDGET MAHER *vs.* BOSTON AND ALBANY RAILROAD COMPANY.

Suffolk.      November 29, 30, 1892. — January 5, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Employers' Liability Act — Railroad — Loss of Life — Due Care — Instantaneous Death — Negligence.*

In an action against a railroad corporation, under the St. of 1887, c. 270, for causing the death of a brakeman in its employ, who was a skilful man and was apparently killed by reason of his head coming in contact with a bridge, no one having seen the accident, evidence that his duty required him to be on the rear car of a freight train, which on this occasion was a tall refrigerator car attached to the rear end of the caboose, and to watch the rear end of the train, riding on the top of the car with his face to the rear, although he knew there were low bridges under which the car must pass, warning of the approach to which was expected to be given by tell-tales, one of which, guarding the approach to the bridge in question, was out of order, will justify the inference that he was in the exercise of due care.

In an action against a railroad corporation, under the St of 1887, c. 270, for causing the death of a brakeman in its employ, who, no one having seen the accident, was apparently killed by reason of his head coming in contact with a bridge while riding on the top of a tall refrigerator car attached to the rear end of the caboose of a freight train, the facts that the speed of the train was about twenty miles an hour, and the lesions upon his head were sufficient to produce instant death, that the men in the caboose, although very near him, heard no outcry, and that the defendant's workmen upon another train, who picked up the dead body, were not called as witnesses, justify the inference that he died instantly, or without conscious suffering.

In an action against a railroad corporation, under the St. of 1887, c. 270, for caus-

ing the death of a brakeman in its employ, who, no one having seen the accident, was apparently killed by reason of his head coming in contact with a bridge, while riding on the top of a tall refrigerator car attached to the rear end of the caboose of a freight train, the declaration alleged negligence in running the car under the bridge, and also in improperly guarding the approach to the bridge. At the trial, there was evidence that this was not a customary arrangement of the train, the caboose usually being at the rear end; that the speed of the train was about twenty miles an hour, which was also unusual; and that the tell-tale guarding the approach to the bridge was out of order. The defendant asked the judge to rule that the jury could not find for the plaintiff, on the ground that the defendant negligently ran the car under the bridge. The judge refused so to rule, and, while in his charge the contention that the car was run carelessly was adverted to, the jury were instructed that, in order to find for the plaintiff, they must be satisfied that the defendant was negligent in not having the tell-tales, and that their absence was the cause of the accident. *Held*, that the defendant had no ground of exception.

TORT, under the St. of 1887, c. 270. The material part of the declaration was as follows: " And the plaintiff says that she is the mother and next of kin of Peter W. Maher; that on or about February 4, 1891, the said Peter W. Maher, now deceased, was employed by the defendant corporation; that while he was so employed, and in the exercise of due care, the defendant so negligently and carelessly ran a car, upon which he was required in the course of his employment to be, under a bridge, and so negligently and carelessly protected him in properly guarding the approach to said bridge, thereby not notifying him of his approaching the same, that he, the said deceased, was knocked off from the said car and killed." Trial in the Superior Court, before *Aldrich*, J., who allowed a bill of exceptions, in substance as follows.

The plaintiff gave to the defendant the notice required by the statute of the time, place, and cause of the injury within thirty days thereafter, and the same was put in evidence.

The plaintiff testified that she lived in Binghamton, New York, and had lived there for the last five years; that Peter W. Maher was her son, and had lived there with her, following the business of railroading; that her daughter Hannah had also lived with her during that time; that her other children were married and lived elsewhere, and her son took care of her, and saw that she wanted for nothing; that he was not away until he came to Boston, which was four or five weeks before he was killed; that he provided the house and furnished all that she

needed; that she had no other means of support except working
for her living since he lived with her; and that he had sent her
some money a week before he was killed.

Hannah Maher testified that she was a sister of Peter W.
Maher, and lived with him and her mother at Binghamton; that
her brother provided the board; that she was twenty-one years
old when he died; and that she was a tailoress, and worked as
such, and contributed what she could of her wages to the sup-
port of her mother, but that she could do very little.

Edwin White testified that he was a locomotive fireman, on
the New York and New England Railroad, and knew Peter W.
Maher at Binghamton; that Maher was a conductor in the
Erie Railway yard at Binghamton, and spare conductor and
switchman; that he was a skilful, able man in his business;
that he met him on the way from Binghamton, and came with
him to Boston, and they got employment on the defendant's
railroad about January 17, 1891; that Maher was killed on
February 4, 1891; that he was then the rear brakeman on a
freight train; that the witness did not work on the same train
with him, Maher working days, while he worked nights; that
he went to the morgue and examined Maher's body after the
accident; that he found a blow over his eye, a large scar, and
the back of his head badly bruised; that his skull was broken
in at the back; that it looked as if it might have been hit with
a sharp edge; that the next morning he was coming from
Worcester, and his train stopped under the Back Bay Park
bridge in Boston, and he examined the bridge and found flesh
and hair on the stringer of the bridge, which was an iron beam
with a flange on the lower side standing out four or five inches,
with a rough edge right over the car as it passes under, and on
the bridge he found that part of the smoke which covered the
paint on the edge of the stringer was knocked off, and he also
saw that some of the wires of the tell-tale were gone; that these
wires were about three feet long, connected with a small piece
of wood about five feet long, and dangled down so as to hit a
man in case he was going under the bridge; that he knew what
kind of a car Maher was on at the time he was killed, and had
measured the same build of cars; that he knew which car Maher
was on because he saw the car that morning when he was on it;

that he was getting on his car then, and had hold of the brake wheel; that that car was the same size as the one he measured, which was twelve and a half feet high; that he measured the distance from the place where he saw marks of flesh and hair to the rail, and it was about fourteen and a half feet; that the brake was about eight inches above the top of the car; that the only way to set these brakes on a car was to put one foot against the dog and bend over, but a man might get down on one knee.

On cross-examination, he testified that he looked the bridge over on February 5, but made the measurements some time, perhaps two months, afterwards; that there were a good many of these refrigerator cars in use which are twelve feet and six inches high; that they are cars which bring provisions from the West, and in his business he was familiar with using them; that the stringer of the bridge on which he saw the marks was the first one toward the east, and it was about even with the abutment of the bridge, but the bridge overhangs the stringer probably two feet; that the tell-tale was about one hundred feet east of the bridge; that the wires of the tell-tale sometimes get broken off, and he had seen them thrown up over the bar, but had never known a brakeman to throw them up; that the point where the Boston and Albany Railroad crosses the Providence division of the Old Colony Railroad is east of the place where Maher was injured; that in going from that crossing toward the west the first overhead bridge that one passes under is the Huntington Avenue bridge, that the next one is the Boylston Street bridge, that the next one is a tower bridge, West Chester Park bridge, and the next bridge the Back Bay Park bridge, where Maher was injured; that in the morning of February 5 he saw blood on the sleepers of number one track under the bridge, near the centre of the bridge; and that there had been a tell-tale there, and the bar of the tell-tale and some of the wires were still there, but a part of the wires were gone.

Charles W. Hibbard testified that he was a police officer on the Back Bay, and that the bridge in question came on his beat, and he was familiar with it; that Maher was killed on February 4, as he knew, because his attention was called to it by a man on the defendant's track; that he then went to the bridge and found twelve of the tell-tales gone from number one track; that

he had noticed the absence of those wires previously to that, perhaps a week or so; and that he did not examine the place under the bridge, but reported to his sergeant, and he went down and brought up some blood and laid it on the sidewalk. On cross-examination, he testified that, when he said that twelve tell-tales were gone, he meant that twelve brass wires which hung over the bar were gone; and that this tell-tale was about ninety or a hundred feet from the bridge.

Hector Scott testified that he was a freight brakeman on the Boston and Lowell railroad; that, at the time of the injury to Maher, he was at work on the defendant's railroad as hind middle-man on the train with Maher; that Maher was the tail-man, and his position was on the rear car; that he was killed about eight o'clock in the morning of February 4, 1891; that they left Boston with the car, caboose, and engine gang; that the gang was composed of the engineer, fireman, conductor, and four brakemen; that they picked up a car at the Back Bay, a Swift's refrigerator car, which was one of the high cars, and started for Brighton; that this car was taken in the rear, behind the caboose; that this was not customary; that he had not known it to be done before; that he had been in that gang from January 17; that from that time until the morning of the accident, he did not remember that the train had ever been made up in that way; that the brake on the caboose was down on the platform; that he thought the train was going eighteen or twenty miles an hour that morning; that he could not say if that was an unusual rate of speed; that he was in the caboose, and the first he knew of the accident was when they got to Cottage Farm and missed Maher; that they then went back and found that a passenger train had picked him up, just ahead of them; that the train was on number one track when he was killed; that he examined the track and found blood there; that he found twenty to thirty inches' space of the tell-tale gone over the middle of the track; that that was about where his brake was; and that he could not say what the action of the smoke was that morning. On cross-examination, he testified that, when he said that the tell-tale was gone for twenty or thirty inches, he meant that that width of the wires was gone, but that some of the wires were there; that the blood marks

were on number one track, about ten feet west from the east side of the bridge; that the brake-handle was usually on top of the car on freight cars, very few being at the end; that in making up a train, the caboose was not always the farthest from the engine, and sometimes was not there at all; and that he had observed the tell-tale at the bridge two or three days before the accident, and there were a number of wires from the tell-tale missing.

John Evans testified that he was freight brakeman on the Boston and Lowell Railroad, and was on the train with Maher the day he was killed; that he was in the caboose at the time he was killed; that Maher was the rear-man, and his position was to take care of the rear end of the train; that it was necessary that the rear brakeman should always be in his position; that the train was going at an unusual rate of speed when he was killed; that he could not say anything as to the smoke of the engine on that morning, it acting differently on different days and in different weather; that the train was made up differently that day, as they had a car that was put on at the rear end of the train; that the caboose was usually the rear end of the train; that he did not know why this car was on the end instead of the caboose, it was simply a matter of convenience; and that the train was under the control of the conductor. On cross-examination, he testified that, when Maher went out of the caboose, he heard him told to get on the top with the flag, ready to flag the rear end.

Charles F. Allen testified that his business was railroading; that he was working on the Old Colony Railroad when Maher was killed; that on the next morning he rode in with White, and saw that some wires were gone on the tell-tale, and there was blood on the bridge and blood on the ground; and that this was over the number one track, over the place where the brake on the car was.

William B. Murphy testified that he was sergeant of the Back Bay Park police, and made an examination of the bridge when he was told that there had been an accident there; and that he found blood on the road-bed, and that the pendants of the tell-tale were nearly all gone.

This was all the material evidence in the case, the defendant offering no evidence.

The defendant asked the judge to instruct the jury, among other things, as follows: "1. Upon all the evidence in the case, the plaintiff cannot recover.  2. The jury cannot find for the plaintiff in the case at bar, on the ground that the car on which Maher was, was negligently run under the bridge. . . .  4. There is no evidence upon which the jury can find, in the case at bar, that the car upon which Maher was, was negligently run under the bridge. . . .  7. Evidence as to the arrangement of the train is only to be considered upon the question of due care."

The judge refused to give these instructions, except so far as they are embraced in the instructions given; and the defendant excepted.

The judge instructed the jury, among other things, as follows:

"This action is based upon two allegations of negligence, or carelessness, on the part of this defendant; one is, that they ran the car carelessly; and the second is, that they did not sufficiently guard the approaches to this bridge.  The plaintiff, in order to maintain this action, must satisfy you of two things. She must satisfy you that the defendant was careless, and careless in the respect in which she charges carelessness; and second, she must also satisfy you that the intestate, the deceased, was at the time of this accident in the exercise of due and proper care, taking care of himself.  There is a third proposition which I will state later on, because it does not connect itself directly with these two.  You have been addressed upon these complaints, particularly as to the latter one; that is, that the approaches to the bridge were not sufficiently guarded.  The particular defect in the guarding of this bridge which is complained of is that these suspended wires or tell-tales were absent, so that, upon approaching the bridge, he had not the benefit of that precaution.

"The next question for you to consider is whether that defect was the cause of this accident; because it makes no difference how defective the machinery may be, or all the apparatus that is provided for the safety of the employees, unless the defect is the cause of the injury; and therefore you are to find in this case, in order to render a verdict for the plaintiff, not only that this was defective, but that that defect was the cause of his injury, of his accident, and cost him his life.

"Then she must prove to your satisfaction that this man was, at the time of the accident, in the exercise of due and proper care.

In this case, upon the question as to what this man was doing at the time, of course, you have not the benefit of his statement. You have not the benefit of the statement of anybody who saw him at the instant. You are asked to judge as to whether he was or was not in the exercise of due care by such evidence as has been submitted to you, which tends to show where he was a short time, a few minutes more or less, before this accident occurred, and what he was doing, and what his duty was. He was charged with one of these cars and with a brake there. He was not required to stand at his brake and come in contact with that bridge knowingly. That was not his duty. He was required to take care of the brake, and to use proper skill and care in doing . . . it, in performing that duty, and also in taking care of himself.

" You must be satisfied, upon the evidence, affirmatively that he was at the time of this accident in the exercise of that degree of care of a prudent man engaged in that business, and having experience, the experience which the evidence in this case discloses that this man had, — whether more or less, that will be for you to judge, — and from which you are to find that he was in the exercise of care as I have described it to you. If the evidence fails to prove that to your satisfaction, then the plaintiff has failed altogether, because she must satisfy you by proof. . . . It must be evidence that brings conviction to your minds, so that you would be willing to act upon it in an important transaction in which you yourselves are interested. . . . For the law says that if his own want of care contributed in any measure to his accident, however serious the accident is, the plaintiff cannot recover. She must satisfy you that it was the fault of the defendant throughout, and, if she has satisfied you of that, then, so far as those two propositions are concerned, the plaintiff would be entitled to a verdict.

" Then there is a third question which I referred to a moment ago, that under this action you must be satisfied that the death of this man was instantaneous, in other words, that there was no period of conscious life or suffering after he was struck. If these three questions are answered by you in the affirmative, that the defendant was negligent in not having its tell-tales, and the absence of those tell-tales was the cause of this man's accident, and that he was in the exercise of due care at the time, so that

his own carelessness or want of care did not in any measure contribute to his injury, and you further find that the death was instantaneous, and find all those propositions upon the evidence in the affirmative, then the plaintiff has made out the case, so far as the liability is concerned, and the defendant would be liable, if you are satisfied upon all those questions."

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*W. Hudson*, for the defendant.

*L. M. Child*, for the plaintiff.

BARKER, J. 1. There is sufficient evidence to justify the inference that the deceased was in the exercise of due care. His duty required him to be on the rear car of the train. This was a tall refrigerator car attached to the rear end of the caboose. When he left the caboose, he was told to get on the top of this car with the flag, ready to flag the rear end; and one witness saw him getting on the car, holding to the brake-wheel. His duty required him to watch the rear of the train, and it may well be inferred that he rode on the top of the car with his face to the rear. It was not negligent for him so to ride, although he knew there were low bridges under which the car must pass, because he had the right to suppose that the tell-tales would be in order and in their proper position, and that he would by means of their action, receive sufficient warning to enable him to avoid collision with bridges. There is a fair presumption that he, a man skilful and able in his business, who had just entered on the service of a new employer, and who, in the performance of an explicit order, had gone to attend to work which required him to look in the direction opposite that where the danger lay by which he was killed, was engaged in watching the rear of the car, and if so he could not be blamed for not knowing he was about to come in contact with the bridge. In *Corcoran* v. *Boston & Albany Railroad*, 133 Mass. 507, it was impossible to say whether the deceased was knocked from the train by contact with overhanging ice, or fell upon the track from some other cause. In *Riley* v. *Connecticut River Railroad*, 135 Mass. 292, the position of the brakeman was at the head of the train, and his duty required him to keep watch in the direction of the bridge. So in *Shea* v. *Boston & Maine Railroad*, 154 Mass. 31,

the employment necessarily required him to look out for all engines and trains, as they might come at any time. In the present case the deceased was required to look out for a bridge only when warned by the tell-tales. In *Tyndale* v. *Old Colony Railroad*, 156 Mass. 503, it was the duty of the deceased, as track inspector, to keep his tricycle out of the way of passing trains; and there was no evidence to show what he was doing at the time of the accident or how it occurred. We regard this case as analogous to *Maguire* v. *Fitchburg Railroad*, 146 Mass. 379. The deceased was rightfully in the place of danger, and was not wanting in diligence in suffering himself to come in contact with a bridge of which the tell-tale gave no warning.

2. Assuming that the deceased was knocked from the rear car by the contact of his head with the bridge, the evidence justifies the inference that he died instantly, or without conscious suffering. The speed of the train was about twenty miles an hour, and the lesions upon his head were sufficient to produce instant death. The men in the caboose, although very near him, heard no outcry, and the defendant's workmen upon the other train, who picked up the dead body, were not called as witnesses. It is fair to infer that, if they had seen any indication that the deceased lived after receiving the blow upon the head, they would have been called. See *Mulchahey* v. *Washburn Car Wheel Co.* 145 Mass. 281.

3. We have no doubt that the defendant is not answerable for the fact that the refrigerator car was drawn behind the caboose, or that the train was run under the bridge with the car in that position. Any risk to which the deceased was exposed because the refrigerator car was behind rather than in front of the caboose was obvious and apparent, and was assumed by the deceased; nor was the speed of the train, if upon the evidence it could be found excessive, a circumstance for which the defendant was answerable under the declaration. The second and fourth requests might therefore have been properly given, but we see no reason to suppose that the omission to give them worked any injury to the defendant. The report of the charge makes it evident that, while the claim that the car was run carelessly was adverted to, the case was put to the jury by the presiding justice upon the other contention of the plaintiff only;

namely, that the defendant did not sufficiently guard the approaches to the bridge. They were instructed that the plaintiff must satisfy them that the defendant was negligent in not having its tell-tales, and that the absence of the tell-tales was the cause of the accident, and under the charge the jury could not have rendered a verdict for the plaintiff upon the other theory of the case. It is apparent that the omission of the presiding justice to deal specifically with the second and fourth requests was because he had in effect disposed of them by telling the jury that in order to find for the plaintiff they must be satisfied that the defendant was negligent in not having the tell-tales, and that their absence was the cause of the accident. When he put the case upon that basis, the matters embraced in the second and fourth requests became immaterial, and were doubtless considered so by him; and unless the defendant called his attention, after the charge, to the omission to give them as a ground of exception, we think the defendant must be taken to have acquiesced in this treatment of the case; while the jury were not distinctly told that they could not find for the plaintiff on the ground that the car was negligently placed or run, they were so told in effect, and we see no reason to believe that the verdict was upon any other ground than the absence of the tell-tales.

*Exceptions overruled.*