## HOLLAND v. BROWN et al.

*(District Court, D. Oregon. May 22, 1888.)*

1. DEATH BY WRONGFUL ACT—ACTION BY ADMINISTRATOR—DAMAGES.
The damages given to an administrator for the death of his intestate by the statute of Oregon (Comp. 1887, § 371) are, when recovered, assets of the estate. They do not include anything but what is consequent on the death, and therefore no allowance can be made for the expenses of the illness attendant on the injury which caused the death, or of the burial of the deceased.

2. SAME.
These damages are in the nature of a compensation paid by the wrong-doer to creditors and next of kin of the deceased for the loss of life in which they have a pecuniary interest, and incidentally the liability to pay them is calculated to secure from carriers and corporations more consideration for the lives of passengers and employes committed to their care.

3. SAME—LIABILITY OF VESSELS IN FAULT.
    Ferry-boat No. 2 and the steam-launch Mikado collided in the Willamette river, in front of the Portland slip of the former, and thereby caused the death of a passenger on the latter, when such collision might have been avoided and the death prevented by the proper handling of either boat. *Held*, the owners of both boats are liable to the administrator of the deceased, under the statute of Oregon, *in solido*, for the damages resulting from such death.

(*Syllabus by the Court.*)

In Admiralty.
*William H. Effinger*, for libelant.
*Rufus Mallory*, for Brown & McCabe.
*John W. Whalley*, for receiver, Koehler.

DEADY, J. This suit is brought by the libelant as the administrator of the estate of Philip J. Holland, deceased, against the defendants J. A. Brown and William L. McCabe, as owners of the steam-launch Mikado, and Richard Koehler, as the receiver of the United States circuit court of this district, of the property of the Oregon & California Railway Company, the owner of the steam ferry-boat No. 2, to recover damages for the death of said Philip, alleged to have been caused by the concurring negligence and misconduct of the persons in charge of said boats, respectively, on October 26, 1886.

    The owners of the Mikado and the receiver answer separately, and the controversy has assumed a three-sided form; each defendant practically admitting that the deceased came to his death by the fault of the person in charge of the other's boat. Brown and McCabe also allege that the negligence of the deceased contributed to his death; and both defendants allege that his death was no loss to his estate. The character in which the libelant sues is admitted.

From the pleadings and evidence in the case, and a view of the vicinity where the injury occurred, I find the following facts:

On and before October 26, 1886, the Oregon & California Railway Company was the owner of the steam ferry-boat No. 2, then running under the direction of the defendant Koehler, receiver as aforesaid, as a ferry-boat on the Willamette river, between her slip at the foot of F street in Portland, and her landing on the east side of the river, a distance of about 1,000 feet across the stream and 800 feet down the same from said slip.

The ferry-boat is a double ended, heavy, side-wheel, iron boat of great power. about 130 feet long and 54 feet wide over all,—her guards projecting beyond her hull some 10 to 12 feet, and about 8 feet above her water-line, and is capable of making 12 miles an hour, and of stopping when under way, at full speed, in about 70 feet.

At the same time the defendants Brown & McCabe were the owners of the steam-launch Mikado, then engaged in carrying passengers between Portland and Albina,—a distance of about a mile,—starting from her dock in Portland, between D and E streets, and about 360 feet above the ferry slip. The Mikado is a propeller about 45 feet long and 12 feet beam, and can make 10 to 12 miles an hour. She has a pilot-house a few feet aft of her stern, back of which is a cabin on deck and an open space at the stern, for the accommodation of passengers, of which she can carry 60.

Brown & McCabe are stevedores, and the Mikado was being used by them

to carry their workmen down the river, to assist in loading and unloading vessels. Brown usually acted as pilot, for which he had a license from the United States inspectors. At this time the owners of the Mikado were under contract with Robert MacIntosh, a ship carpenter of Portland, to carry his workmen to and from their employment between the *termini* of her route, at so much a month.

On the morning of October 26, 1886, the Mikado was at her dock with 35 or 40 passengers on board, mostly workmen going to their day's labor, including the deceased, who was then in the employ of MacIntosh as a "liner" of ships and "handy man." Brown, the pilot, was not on hand. Arthur Jones, a youth between 17 and 18 years of age, who is now engaged as fireman on the Northern Pacific Railway, and was then employed on the boat in some subordinate capacity, often took the wheel under Brown's direction. The time having arrived for the passengers to go to their work, Jones undertook to make the trip as pilot. Accordingly the Mikado was started out, head up stream, and swung around till her bow pointed down stream, at about 250 feet from the west shore and her dock, when Jones observed the ferry-boat coming out of her slip on the way across and down the river to her east shore landing. He immediately gave one blast of his whistle, to signify that he intended to pass to the right. The pilot of the ferry-boat immediately responded with one whistle, and, instead of porting his helm and passing to the right, up stream, stopped his engines. At the time these signals were given, the ferry-boat had moved out from her slip about 20 feet, and the Mikado was about 300 feet above the point where the courses of the two boats, if continued, would cross each other at right angles.

The ferry-boat had not yet gotten steerage-way, and was moving directly across the river at about three miles an hour, while the Mikado was moving down stream at about five miles an hour, with her helm slightly to port. The ferry-boat, by force of the impetus already obtained, continued to move forward through the water after her engines were stopped, and the Mikado did not change her course or slacken her speed until the collision was imminent or unavoidable, when she ported her helm and stopped her engine. About the same time the ferry boat reversed her engines.

The port side of the bow of the Mikado came in contact with the starboard side of the ferry-boat, about 20 feet aft, at an angle of about 45 deg., and ran under the latter, which pushed the pilot-house of the Mikado, with Jones in it, off into the river on the starboard side.

At and just before the collision took place the deceased, with two other passengers, was standing on the deck of the Mikado in front of the pilot-house. One of them saved himself by jumping overboard and the other by springing up onto the guard of the ferry-boat. But the deceased was caught about the head, between the guard and pilot-house, and badly hurt, from the effects of which he subsequently died. Among other injuries, his jaw was broken and his skull fractured at the base, which resulted in an abscess on the brain, that was the immediate cause of his death.

There was neither wind nor current to interfere with the action or management of the boats, and either could have been stopped, backed, or turned aside without difficulty in time to avoid the collision.

From these facts, but one conclusion can be drawn. The management of both boats was in fault. The first duty of a person in charge of a vessel, particularly where the lives of passengers are at risk, is to avoid a collision by all means.

The Mikado was moving at the rate of 5 miles an hour, and the ferry-boat at the rate of 3, when the whistles were blown. The former would

cross the course of the latter in a distance of 300 feet. The ferry-boat was then 20 feet from shore, and her length was 130 more, which made her bow 150 feet out in the stream. The ferry-boat was making $4\frac{2}{3}$ feet a second, and the Mikado $7\frac{1}{4}$ feet in the same time. At this rate the Mikado would pass over the 300 feet in a little less than 41 seconds, while the ferry-boat would move forward 150 feet in a little more than 36 seconds, and thus bring them both to the point of intersection within less than 5 seconds of each other.

From this it is evident that it ought not to have escaped the attention of a competent and attentive pilot that if the two boats continued to move as they did at and after the whistles were blown, the Mikado would most likely collide with the ferry-boat at some point along her length of 130 feet. The engineer of the ferry-boat testified that he got the bell to reverse the engines in about a half minute after they were stopped. In that time the ferry-boat would move over about 140 feet, which would put her bow 290 feet from the shore, and at right angles with the course of the Mikado, when her engines were reversed. It is therefore quite evident, notwithstanding the testimony to the contrary, that the engines of the ferry-boat were not reversed until or just before the moment of collision.

These conclusions as to distances, times, and rates of speed are, of course, only approximately true. They are drawn from widely discrepant and contradictory statements of witnesses, most of which are at best but indefinite impressions and off-hand guesses.

But of this fact there is no doubt: These two boats came into collision under circumstances from which it plainly appears that either of them might easily have kept out of the other's way, and that the death of Philip J. Holland was caused thereby.

The pilot of the ferry-boat, after responding to the signal of the Mikado, and seeing that she was about to pass directly in front of him, ought to have reversed his engines at once, and thus have avoided the collision. Instead of this he allowed his boat to keep moving forward towards the point of collision, apparently relying on the fact that there was plenty of room for the Mikado to pass to the starboard of him, and if she did not keep out of the way, and a collision occurred, she would certainly get the worst of it, and be more careful in the future.

On the other hand, when Jones saw that the ferry-boat was moving through the water at right angles with his course, and her forward end within less than 200 feet of it, he ought to have ported his helm, and passed at least 100 feet in front of her, or reversed his engines and waited for her to go by. Instead of this, he willfully held on his way, acting apparently on the idea that as he had what, by virtue of the signals, he called "the right of way," he was justified in passing so far to the left as to compel the ferry-boat not only to stop her engines, but to reverse them to back out of his way; and this, notwithstanding there was a breadth of not less than 700 feet of good water on his right, the very side of the river to which he was bound, and the obligation he was under, to carry the deceased and his fellow-passengers safely, so far as practicable, "by

the exercise of human care and foresight." *Shoemaker* v. *Kingsbury*, 12 Wall. 376.

Indeed, I think the Mikado was primarily in fault, in undertaking to cross the bow of the ferry-boat in such proximity to it, while it was moving forward, especially while there was so much open water and free way on her starboard. The signal made by the Mikado did not give her the absolute "right of way" over any particular part of the river. It only signified that the Mikado would pass to the starboard of the ferry-boat, and therefore the latter must pass to her starboard or slow up or stop until she got by. It would have been very inconvenient for the ferry-boat to have kept under way and ported her helm, as that would have taken her up stream, while her course was diagonally down stream. Therefore, she might properly slow up or stop until the Mikado passed. But the ferry-boat is a large machine,—a floating bridge,—an established and licensed method of transit, moving to and fro at regular and short intervals on the line of a great interstate thoroughfare; and, in my judgment, it is an abuse of the sailing rules prescribed by section 4233 of the Revised Statutes—particularly in and about the wharves and harbor of this city—for every little cockle-shell of a craft that catches the ferry-boat coming out of her slip to whistle for the so-called "right of way," and thus compel her not only to stop her engines but reverse them, so the cockle-shell can pass immediately in front of the great boat with impunity, instead of waiting a few seconds until she has passed on.

But in this proceeding the misconduct of the one party does not excuse the other. The pilot of each boat was bound, irrespective of the propriety of the conduct of the other, to do what he could to avoid a collision on account of the danger to human life.

In the consideration of this question no specific effect has been given to the fact that the Mikado did not have a licensed pilot at the wheel. For thus acting without license Jones may be proceeded against under the law personally, and Brown has already paid a fine. But in this suit the only inquiry, so far as the Mikado is concerned, is, was she in fault, whether managed by a licensed or unlicensed pilot? But, in considering the propriety of Jones' conduct on the occasion, it is impossible to altogether overlook the fact that he was an inexperienced and determined youth, who probably was more concerned to assert what he called his "right of way" against the "big boat" than to avoid a collision.

Although this suit was brought on the theory that this court might have jurisdiction of the wrong complained of, without the aid of any statute of congress or the state, and therefore the damages were only limited by the judgment of the court, yet on the hearing it was admitted, on the authority of the case of *The Harrisburg*, 119 U. S. 199, 7 Sup. Ct. Rep. 140, that the right to damages at all was derived from the statute of the state, which limits the amount to $5,000, and therefore the claim in the libel for $10,000 damages was abandoned. In addition to the claim for general damages the libel contains a claim for special damages, arising from the expenses of the last sickness and burial of the deceased, amounting to $1,415.

A statute of Oregon (Comp. 1887, § 371) gives the administration of a person whose death "is caused by the wrongful act or omission of another" a right to recover damages therefore, not exceeding $5,000. The damages, when recovered, are assets of the estate, and must be disposed of accordingly. They are 'assessed for the pecuniary injury to the deceased person's estate caused by his death. Nothing is therefore allowed for the sufferings of the deceased, nor as a solace to the survivors.

The right to these damages may be enforced in the admiralty, whenever the wrong which caused the death occurred, as in this case, on a navigable water of the United States. See Holmes v. Railway Co., 6 Sawy. 262, 5 Fed. Rep. 75, and cases there cited; also Ladd v. Foster, 31 Fed. Rep. 827.

In estimating the damages resulting from the death of the deceased to his estate, his age, health, habits, and disposition and capacity to labor and make and save money and acquire property must be considered. Holmes v. Railway Co., 6 Sawy. 262, 5 Fed. Rep. 75.

The deceased was about 40 years of age, and in good bodily health and strength. He was not in the full sense of the term a skilled workman; but his brother, the libelant, is a master ship-carpenter, and the deceased worked at and about this business, and was considered a willing, "handy man." His employer at the time of his death, a master ship-carpenter, with whom he was once a partner, gave him employment about half the time at five dollars a day. Another master workman said he paid for the same kind of work four dollars a day. At the same time the evidence shows that he was what is called a "good fellow," given more or less to drink and dissipation when not employed, and, although he had no one but himself to support, died worth nothing. There are some circumstances, however, which tend to show that a short time before his death he had gone to live with his brother, the libelant, and was intending and attempting a new and better life. He does not appear to have been married, and his relatives, so far as the evidence discloses, are the libelant and a sister.

He was capable of earning probably $4 a day for 300 days in the year, and, supposing he would lay up $400 a year of this sum for 20 years, the simple money value of his life might be worth the present sum of $5,000. But it is impossible to say whether he would have done so or not. It is possible that he might, but the probabilities are all against it.

The case of Railroad Co. v. Barron, 5 Wall. 90, arose under an Illinois statute that contained a direction which, though not expressed in the Oregon statute, is fairly implied in it. It reads: "The jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death to the wife and next of kin of such deceased person, not exceeding the sum of $5,000." In commenting on this statute the court, speaking by Mr. Justice NELSON, says:

"We do not think it necessary to prove actual pecuniary loss. It can rarely be done. The attempt to do it would substitute the opinions of witnesses for the conclusions of the jury. The facts proved will enable the jury to decide

on the proper measure of responsibility. Some cases are harder than others, and the law intends the jury shall discriminate in different cases. There is no fixed measure of damages, and no artificial rule by which the damages in a given case can be computed."

In *Railroad Co.* v. *McCloskey*, 23 Pa. St. 526, a case arising under a somewhat similar statute, it is said:

"The principle which requires compensation for the death of a freeman is not at all new in history. It was long an institution among our Anglo-Saxon ancestors; and perhaps it was never positively abolished, but rather died out under the influence of the Norman conquest and the centralizing power of the king's courts, which treated all such wrongs as wrongs done to the king, and hence as criminal offenses. It seems to have been an institution common to all Germanic nations, and perhaps to every people that rose one degree above the savage life, and were still striving to rise. With them it was intended as a compensation to surviving kindred, and as a means for preventing the disorders that follow in the train of private revenge."

This was the ancient Saxon *weregild*, or price of a homicide or other crime, whereby a fixed pecuniary compensation was made to the next of kin for the death of a relative. Every man's life had its value, called a "*were*," and in the time of King Athelstan the *were* of every order of persons in the state, from the king to the cheorl, was fixed by law. Blount, Law Dict. "Weregild," 1 Reeve, Eng. Law, 15; 4 Bl. Comm. 188, 313.

And although the primary purpose of the modern statute, like that of the ancient custom, is to provide compensation for the injury rather than to inflict punishment for the wrong, yet in estimating the damages for the former it may be well to remember that the liability to pay them may have the effect to inculcate a wholesome regard for human life, and compel carriers and corporations having the persons of passengers and employes in their care to a faithful discharge of their duty towards them.

Giving due weight, then, so far as I can, to these facts, probabilities, and considerations, my judgment is that the damages for the death of the deceased ought not to exceed $2,500.

The items of expense of the sickness and burial of the deceased, concerning which any proof was offered, are as follows: 56 days in St. Vincent's hospital, with day and night nurse, and shroud and liquor, $168; undertaker, $94.50; carriage hire, $23; ferriage, $5.30; grave, $15; priest and choir, $25; physician, $325. In all, $670.

I do not think anything can be allowed in this suit for these expenses, —at least as such. True, they are the result of the wrongful conduct of the defendants which caused the death of the deceased. But the action given by the statute is for the death simply. This includes, of course, all such losses to his estate, or creditors and next of kin to whom it belongs, and for whose benefit the action is allowed, as may be fairly implied from the cessation of his life.

The fact on which the damages are computed is death and its consequences, and not its antecedents or cause. And yet it is manifest that the estate of the deceased is injured or diminished by these expenses. The damages allowed in this case must first be applied by the administrator to the payment of what may be found justly due the creditors of

the estate on this account. For this reason it might be proper and convenient to have the probable amount of these expenses considered in estimating the general damages. But as the statute, in my judgment, does not authorize the recovery of damages on any such account, the claim must be rejected.

The defense of contributory negligence remains to be considered.

The burden of proof in this behalf is on the defendant alleging the negligence. The only particular in which it is claimed that the conduct of the deceased contributed to his death is that he occupied a place on the forward deck instead of the cabin or the after one. Ordinarily there was no unusual danger in being there. There was nothing to indicate that passengers were not allowed forward of the pilot-house. Jones does not say that he gave the passengers any warning on the subject on this occasion, though he thinks he did speak of it at some other time in the hearing of the deceased. If this was a dangerous position under ordinary circumstances, it was the duty of the owners of the boat to provide some means of restraining or warning passengers from going there. The fact that on this occasion the deceased and two others stood on this deck just in front of the pilot-house, right under the eye of the pilot, without a word or suggestion from him to the contrary, proves that the position was not regarded by the latter as one of any particular danger.

But it is said that he was negligent in remaining there after the collision was imminent. But that is not at all certain. He might have thought, as one of his companions did, that the safest course was to remain and take the chance of getting on the big boat at the point of collision before the little one was run down. His companion, who jumped overboard, said he did so rather than undertake to get back along the narrow space between the house and gunwale, because he thought the Mikado was going to be sunk.

The evidence is meager and obscure on this point, it only appearing that of the three persons who stood on this deck one jumped overboard and another sprang upon the guard of the ferry-boat and was saved, while the deceased, who, for aught that appears, was intending and trying to escape in the same way, was caught by the head between the guard and pilot-house, as in the jaws of a vice, and crushed so that he died; and, but for the fact that the pilot-house gave way and was pushed overboard, he probably would have been killed outright. However, the deceased having been placed in this dangerous predicament by the fault of the defendants, they are liable for his death, even if it appears that it was possible for him to have escaped unharmed. The law does not require skill, diligence, or good judgment from a person in such a situation or moment of danger and excitement, but regards him as one *in extremis*, whose conduct, though erroneous or unwise, it does not consider a fault. *Ladd* v. *Foster*, 31 Fed. Rep. 831, and cases there cited. The defendants, having by their concurrent negligence caused the death of the deceased, are liable, *in solido*, for the damages. Id. 835, and cases there cited.

The libelant is entitled to a decree against the defendants for the sum of $2,500, and costs and disbursements of the suit.