## PERHAM *v.* PORTLAND ELECTRIC CO.

(40 L. R. A. 799; 53 Pac. 14.)

| 33 | 451 |
| 42 | 333 |
| 33 | 451 |
| 43 | 9 |

ACTION FOR DEATH BY WRONGFUL ACT.—The right conferred by sections 369 and 371, Hill's Ann. Laws, permitting a personal representative to maintain an action for decedent's wrongful death is an entirely new one conferred by the statute, and is based on the death of the injured person, not on the injury that caused it, so the right of action exists though the decedent may have been instantly killed.

DEATH BY WRONGFUL ACT—WANT OF RELATIVES.—The fact that there are no surviving relatives or creditors of a person killed by a wrongful act or omission does not preclude a right of action by the personal representatives under Hill's Ann. Laws, §§ 369, 371, making the recovery assets of the estate.

NEGLIGENCE IN PLACING ELECTRIC WIRES.—The owner of electric wires carrying a dangerous current is chargeable with negligence in stringing them over a bridge so near the top of it that it is impossible to make repairs on the bridge without coming in contact with them.

IDEM.—A workman engaged in repairing a bridge over which electric wires with an apparently safe insulation are strung, where he must come in contact with them in performing his work, has a right to assume that contact with them will not be dangerous.

IDEM.—Placing electric wires known to be dangerous at a place where others are lawfully entitled to be constitutes negligence.

ELECTRIC WIRES—IMPERFECT INSULATION.—The apparent perfect insulation of electric wires, which is calculated to deceive and to cause one unfamiliar with the facts to suppose them safe, when the wires are placed where persons in the performance of their duties may come in contact with them, amounts to an invitation to them to risk contact therewith.

QUESTION FOR JURY—CARE TO AVOID INJURY.—Whether a person exercised due care to prevent injury from electric wires is a question for the jury.

HARMLESS ERROR.—In an action for negligently causing death, a refusal to charge that exemplary damages cannot be recovered is harmless where none were asked.

INSTRUCTION TO JURY.—Verbal inaccuracy of a charge to the jury will not require a reversal, if the charge as a whole fairly and accurately presents the law applicable to the facts.

CARE REQUIRED OF ELECTRIC COMPANIES.—The care demanded of electric companies must be commensurate with the danger, and, where the wires carry a highly dangerous current of electricity, the law requires the utmost degree of care in the construction, inspection and repair of the wires so as to keep them harmless at places where persons are liable to come in contact with them.

WITNESS' FEES AND MILEAGE AS COSTS.—A party who is entitled to his costs may recover as disbursements the mileage and per diem of a material witness, residing in the state, who attended the trial at his request, but without having been served with a subpœna.

From Multnomah :   E. D. SHATTUCK, Judge.

Action by W. T. Perham, as administrator of the estate
of N. C. Perham, deceased, against the Portland General
Electric Company, which resulted in a judgment for
$4,500 in favor of plaintiff.

AFFIRMED.

For appellant there was a brief and an oral argument
by *Messrs. Frederick V. Holman, Richard Williams* and
*Emmet B. Williams.*

For respondent there was a brief and an oral argu-
ment by *Messrs. Harry Wildey Hogue, William Wallace
Thayer* and *Sanderson Reed.*

*MR. JUSTICE BEAN delivered the opinion of the court.

This action is brought under section 371 of Hill's Ann.
Laws to recover damages for the death of plaintiff's
intestate, caused by the alleged negligence of the defend-
ant company.   The facts, which are practically undis-
puted, are that on September 27, 1893, the plaintiff's
intestate, an employee of the East-Side Railway Com-
pany, a corporation owning and operating a suburban
railway between Portland and Oregon City, was killed
while engaged in repairing its bridge across the Clack-
amas River by coming in contact with wires owned and
used by the defendant company for the transmission of
electricity from its station in Oregon City to its cus-
tomers in the City of Portland, and which were suspended
over and horizontal with such bridge.   This bridge is
described by the witnesses as a Howe truss with half-
hip connections, 22 feet wide, and the distance between
the top and bottom chords is 35 feet.   Near the ends of
each top chord are four vertical iron rods with nuts and

washers, connecting the top and bottom chords, and the top chords are connected together by 6x8 lateral braces set on edge, crossing each other in the shape of the letter X, and also by iron rods, about an inch in diameter, at either extremity. The main end braces of the bridge run from the ends of the top chords to the outer ends of the bottom chords at an angle of 45 degrees, and are connected together by cross braces similar to the top lateral braces, and also by two timbers $5\frac{1}{2}$ by $9\frac{1}{2}$ inches, called "strut braces," placed horizontally above and below the cross braces. The upper strut brace is $4\frac{1}{2}$ inches below the under side of the top chord, or $20\frac{1}{2}$ inches below the upper surface thereof, and the most southerly lateral rods connecting the top chords of the bridge is 22 inches north thereof, and 13 inches higher than its upper surface. Under a license from the railway company, the defendant had, at the time of the accident, 10 wires strung lengthwise and 35 inches above the top of the bridge, which were attached to pins in cross braces or arms extending from one side of the bridge to the other, and supported by standards resting on the top chords. The wires were placed 1 foot apart, except the two on the west side, between which there was a space of 2 feet.

On the fifteenth of September, 1893, the railway company sent a gang of men under charge of a foreman to repair the bridge, and they were engaged in such work until some time in the following month. While thus engaged, it became necessary to tighten the nuts on the vertical rods connecting the top and bottom chords, and, as this could not be done on the south end of the bridge without moving the arm or brace to which the electric wires were attached, the foreman telephoned, on the morning of the twenty-seventh of September, to the office of the railway company in Portland, asking that a

lineman be sent out to detach the wires, so that the arm could be moved, but, as the company neglected to do so, he concluded to go on with the work and do the best he could. He thereupon directed the deceased and three other workmen to go up on top of the bridge and tighten the nuts on the rods with a large wheel wrench 7 feet and 8 inches in diameter. The wheel part of this wrench was some 15 or 16 inches above the socket which fitted on the nut, and the wrench was operated by workmen sitting outside of the wheel on the chords or braces of the bridge, or boards placed thereon. Before working in and among the wires, the workmen examined them, and, finding that they were covered with the insulating material in common use, and that such covering was unbroken, and apparently in good condition, and receiving no injurious effect from handling them, concluded that they were safe. At the time this examination was made the wires were what are called " dead wires," as the electric current was shut off about 8 o'clock in the morning and not turned on again until about 4 in the afternoon, but of this fact the workmen were ignorant, and they supposed and believed that the wires were live wires all the time, and that the reason they were harmless was because of the insulation. Along in the afternoon, the deceased and his fellow workmen, having completed the work at the north end of the bridge, proceeded to the south end for the purpose of tightening the rods on that end, but, being unable to place the wheel wrench on the nuts because of the standard which supported the cross bar to which the wires of the defendant company were attached, they were directed by the foreman to move it out of the way. At this time the two wires on the west side of the bridge were live wires, but this fact was unknown to the workmen. They proceeded to detach a sufficient number of the wires, beginning at the east side

of the bridge, to enable them to move the east end of the south standard or support a sufficient distance north to permit the use of the wheel wrench; and after taking out the lag screws, which fastened the standard to the top chord, the deceased was directed by the foreman to cross over to the west side of the bridge to a hand line and draw up the tools necessary to be used in fastening the standard out of the way of the wrench. In obedience to this order, he started to walk over on one of the top lateral braces, stepping over the wires and steadying himself by touching them with his hands, and when he reached the two west wires, which were carrying at that time 5,000 volts of electricity, he accidentally took hold of both wires at the same time, and the entire force of the current passed through his body, killing him instantly.

The complaint alleges: That at the time the defendant so placed its wires over the bridge of the railway company it well knew it would be necessary from time to time for such company to cause the bridge to be repaired, and for persons to work upon the top chords and braces thereof; but, notwithstanding such knowledge, it carelessly and negligently strung its wires only $2\frac{1}{4}$ feet above such chords and braces, and in such a manner that it was not possible or practicable for persons to work upon such bridge without coming in contact with and handling the same; and that it carelessly and negligently failed and omitted to protect or cover the wires, and particularly the two west ones, with safe or sufficient insulating material, and that it carelessly and negligently permitted the covering used thereon to become worn, defective, and wholly insufficient to render them safe to persons coming in contact therewith; that it knew the bridge was being repaired during all the times referred to, and particularly on the twenty-seventh day of September, and that it

might be necessary at any time between the hours of 7 o'clock in the morning and 5 :30 o'clock in the afternoon of that day for the workmen to move about among and come in contact with its wires, and that it was not pos-. sible or practicable for them, nor for anyone, to go upon or work upon the top chords or the top lateral braces without so doing; and that it also knew that the deceased was engaged in the work of tightening the vertical rods during the afternoon of the 27th, and that he was necessarily moving about among and coming in contact with and handling the wires, but that, notwithstanding such facts, it carelessly and negligently caused and permitted a high and dangerous current of electricity to be turned into the two wires nearest the west side of the bridge at about 4 :20 o'clock in the afternoon, without notice or knowledge to the deceased or any of his fellow workmen; and that the deceased, while engaged in the performance of his duties and exercising due care and caution, and without any fault on his part, came in contact with said wires, and was instantly killed; that all the workmen on the bridge, including the deceased and foreman, thought and believed it was perfectly safe for them to move about among and touch and handle the wires referred to, because the same seemed to be insulated, but they had no knowledge of the time the current was turned into the wires, but thought and believed they were charged with electricity and were live wires at all times. Then alleges the appointment of the plaintiff as administrator of the estate of deceased, and upon the question of damages avers: "That said Nathaniel Carl Perham at the time of his death was twenty-five years and six months old, unmarried, strong, healthy, temperate, industrious, frugal, of good intelligence and business capacity, and was a skillful carpenter and bridge carpenter and contractor, and was earning and receiving

wages at the rate of $3 per day, and would, if he had continued to live during the ordinary period of life, have continued to earn and receive the same and even greater wages for his services, and would have accumulated property and estate to the present value of $20,000, and that by reason of his death, occasioned by the negligence and wrongful acts and omissions of the defendant, as hereinbefore set forth, plaintiff, as administrator of said estate, has been injured and damaged in the sum of $20,000;" and prays for judgment against defendant for the sum of $5,000 being the limit of a recovery permitted by the statute.

The defendant, by its answer, admits that at the time it placed its wires on and along the bridge in question it knew that it would be necessary to repair the bridge from time to time, and that in doing so persons would be required to go and be upon the top chords and top lateral braces thereof, but it denies that its wires were so placed that it would be necessary for such persons to come in contact therewith, or move about among or handle the same, or that it failed or omitted to protect or cover its wires with proper or sufficient insulating material, or that it permitted the covering used to become worn or defective. But it alleges that it is impracticable to insulate wires carrying such a high voltage as was carried over the wires in question so that they will not be dangerous to the life of persons coming in contact with two of them at the same time; that all of its wires were attached by proper and sufficient glass insulators to wooden cross bars or arms at a height of not less than 2 feet and 10 inches above the top chords and top lateral braces of the bridge, and were new and perfect wires, and the insulating used thereon was in perfect order and condition. It is further alleged that the deceased was guilty of contributory negligence in attempting to step

over the wires in crossing the bridge, but that he should have passed under them, either by creeping along on top of the lateral braces or by crossing on the strut brace at the south end of the bridge, which was about 4½ feet below the wires. The reply put in issue the material allegations of the answer, and a trial resulting in a verdict and judgment in favor of the plaintiff, the defendant appeals, alleging as error : First, that the complaint does not state facts sufficient to constitute a cause of action ; second, that the court erred in overruling its motion for a nonsuit ; and, third, that the court erred in the giving and refusal of certain instructions to the jury.

It is claimed at the outset that the action cannot be maintained, because the statute under which it is brought is a survival statute, and, as the complaint alleges and the evidence shows, that the death of plaintiff's intestate was instantaneous. There was no interval of time between the injury and the death within which the deceased could have brought an action for the injury, and therefore there was no right of action to survive to his personal representatives. The statute provides that a cause of action arising out of an injury to the person dies with the person, except that, " when the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action at law therefor against the latter, if the former might have maintained an action, had he lived, against the latter, for an injury done by the same act or omission. Such action shall be commenced within two years after the death, and the damages therein shall not exceed $5,000, and the amount recovered, if any, shall be administered as other personal property of the deceased person :" Hill's Ann. Laws, §§ 369, 371. It is agreed that at common law there was no remedy by way of a civil action for the death of a human being, and that a cause

of action arising out of an injury to the person died with the person. But the practical impossibility of securing the punishment of mere carelessness by means of a criminal action induced the British Parliament in 1846 to pass what is known as "Lord Campbell's Act," by which a civil remedy is given to the personal representative of one whose death is caused by the wrongful act or omission of another for the benefit of the widow, husband, parent, or child of such person. This statute has been in substance, in one form or another, incorporated into the legislation of most of the states of the Union, and the holding is quite universal that it creates a new right of action for the wrongful death, which may be maintained whether it was instantaneous or consequential. 1 Sherman & Redfield, Neg. § 139; Cooley, Torts, p. 264; and *Seward* v. *The Vera Cruz*, L. R. 10 App. Cas. 59. But the contention for the defendant is that the statute of this state, unlike Lord Campbell's act and the statutes modeled after it, does not create a new right of action for the death, but is a survival statute under which the personal representatives of a deceased person may bring an action to recover damages for the injury which caused the death in cases where the party injured was entitled to bring such action, but died before exercising such right; and in support of this view we are referred to *Belding* v. *Black Hills R. R. Co.*, 3 S. D. 369 (53 N. W. 750); *Kearney* v. *Boston R. R. Corp.*, 9 Cush. 108; *Bancroft* v. *Boston R. R. Corp.*, 11 Allen, 34; *Corcoran* v. *Boston & Atl. R. R. Co.*, 133 Mass. 507; *Riley* v. *Connecticut River R. R. Co.*, 135 Mass. 292; *Mulchahey* v. *Washburn Wheel Co.*, 145 Mass. 281 (1 Am. St. Rep. 458, 14 N. E. 106); *Maher* v. *Boston & Atl. R. R. Co.*, 158 Mass. 36 (32 N. E. 950); *Illinois Cent. R. R. Co.* v. *Pendergrass*, 69 Miss. 425 (12 South. 954.)

But the statutes under which these decisions were

made are essentially different from ours. The statute of South Dakota provides (Comp. Laws, § 5498) that, if the life of any person not in the employment of a railroad company shall be lost by reason of the negligence or carelessness of the proprietor or proprietors of any railroad, his personal representatives may institute suit to recover damages in the same manner that the person might have done for any injury where death did not ensue ; and (§§ 5499) that, if the life of any person is lost or destroyed by the neglect, carelessness, etc., of another person, company or corporation, etc., the widow, heir or personal representative of the deceased shall have the right to sue and recover damages for the death of such person ; and the court held, in the case referred to, that under these provisions of the law a personal representative could not recover for the loss of the life of his intestate, but that such right was conferred exclusively upon the widow or heir, and the personal representative could only recover such damages as the deceased had suffered up to the time of his death. For that reason no action could be maintained where the death was instantaneous. The supreme court of Kentucky, however, in *Givens* v. *Kentucky Cent. R. R. Co.*, 89 Ky. 231 (12 S. W. 257), reached a different conclusion under a similar statute. The statute under which the Massachusetts decisions were made provides that '' the action of trespass on the case, for damages to the person, shall hereafter survive, so that in the event of the death of any person entitled to bring such action, or liable thereto, the same may be prosecuted or defended by or against his executor or administrator, in the same manner as if he were living :'' (Stat. 1842, chap. 89, § 1) ; and, as Mr. Chief Justice SHAW says in *Kearney* v. *Boston R. R. Corp.*, 9 Cush. 108, '' supposes the party deceased to have been once entitled to bring an action for the injury, and

either to have commenced the action and subsequently died, or, being entitled to bring it, to have died before exercising that right." It is therefore held in that state, under what Judge Cooley characterizes (Cooley, Torts, p. 264) as "a somewhat nice and technical construction of the statute," that the action will not lie when the death is instantaneous, but, if there is the slightest interval between the accident and the death, it can be maintained; and that the right does not depend upon intelligence, consciousness, or mental capacity of any kind on the part of the deceased after he is injured and before his death. The Mississippi statute declares that "executors, administrators and collectors shall have full power and authority to commence and prosecute any personal action whatever, at law or in equity, which the testator or intestate might have commenced and prosecuted," and that "executors and administrators shall have an action for any trespass done to the person * * * of their testator or intestate against the trespasser, and recover damages in like manner as the testator or intestate would have had if living, and the money so recovered shall be assets and accounted for as such:" Code, §§ 2078, 2079. The court held that the purpose of the statute is "to save to personal representatives the right to begin and carry on such personal actions as the deceased might have begun and carried on if he had not died," and that the personal representative can have no standing in court where the death is simultaneous with the injury, but in such cases all recoverable damages must be sought by the kindred who have sustained the loss.

It thus appears that the statutes construed by the decisions relied upon by the defendant were, as interpreted by the courts, in each instance designed to prevent a cause of action accruing to the deceased in his lifetime

for an injury to his person from being defeated by his subsequent death, and not to create a new cause of action for the death. But such is manifestly not the purpose or effect of our statute. It provides that when the death of a person is caused by the wrongful act or omission of another, his personal representative may maintain an action therefor,— that is, for the death — if the deceased might have maintained an action, had he lived, for the injury which caused the death. The language of the statute is plain and its meaning obvious. It clearly creates a new right of action in favor of the personal representative for the death itself, and not an action founded on survivorship, or on any cause of action in favor of the deceased. The death, and not the injury from which the death results, is the cause of action under the statute, and the personal representatives are entitled to recover damages for the wrongful taking away of the life itself; and therefore it makes no difference whether the injured party was killed instantly or not. Nor does it matter that the damages recovered become assets of the estate, to be administered upon as other personal property of the deceased, and do not go to certain designated persons as provided in Lord Campbell's act, and in many states of this country. This is but a statutory direction as to the disposition to be made of the damages to be recovered, and does not determine the question as to whether the statute creates a new right of action or is only a survival statute. In the absence of the statute, no right of action for the death exists in favor of any person, and it was clearly competent for the legislature, in creating this new right, to make such provision as to the disposition of the damages recovered thereunder as it might see proper.

The statutes of the various states which have in substance adopted Lord Campbell's act differ widely in this

respect, and it has never been suggested, so far as we are aware, that for this reason they do not give a cause of action for the death.   And actions brought under section 371 have repeatedly been before this court in one form or another, and it has always been assumed that the action was for the death, and that it made no difference, either in the right to maintain it or in the amount recovered, whether the deceased was killed instantly or not: *Carlson* v. *Oregon Short Line & R. R. Co.*, 21 Or. 450 (28 Pac. 497). And the same construction has been put upon the statute by the Federal courts.   In *The Oregon*, 73 Fed. 846, Mr. Justice Bellinger, speaking of the effect of section 371, says : " The Oregon statute, unlike that of Louisiana, does not provide that causes of damage to another shall survive in case of death.   It is substantially like Lord Campbell's act ; and in the case of *Seward* v. *The Vera Cruz*, L. R. 10 App. Cas. 59, the view held was (Lord Blackburn concurring), not that the cause of action survived, but that ' a totally new action is given against the person who would have been responsible to the deceased if the deceased had lived ; an action which, as is pointed out in *Pym* v. *Great Northern R. R. Co.*, 4 Best & S. 396, is new in its species, new in its quality, new in its principle, in every way new, and which can only be brought if there is any person answering the description of the widow, parent or child, who, under such circumstances, suffers pecuniary loss by the death.'   In the case of *Pym* v. *Great Northern R. R. Co.* cited in the foregoing quotation, it was argued in behalf of the defendant that the action maintainable under Lord Campbell's act by the personal representatives of a deceased person is ' a mere continuance of that which would have accrued to the deceased if he had lived ;' but Erle, C. J., said : ' The statute, as it appears to me, gives to the personal representatives a cause of action beyond that which the

deceased would have if he had survived, and based on different principles :' 4 Best & S. 403.   And so in *The City of Norwalk* ( 55 Fed. 98 ), the court considers the right ' a new right,' which is ' none the less maritime because based upon state legislation, where the subject-matter is maritime.' "    And in *Holland* v. *Brown*, 35 Fed. 43, Mr. Justice DEADY said, concerning the same statute :  " The action given by the statute is for the death simply.   This includes, of course, all such losses to his estate, or creditors, and next of kin to whom it belongs, and for whose benefit the action is allowed, as may be fairly implied from the cessation of his life. The fact on which the damages are computed is death and its consequences, and not its antecedents or cause." See also *Lung Chung* v. *Northern Pac. R. R. Co.*, 10 Sawy. 17 ( 19 Fed. 254), and *Ladd* v. *Foster*, 12 Sawy. 547 (31 Fed. 827 ).

The statutes of Kansas and Indiana are identical with ours, except that damages are allowed to the extent of $10,000, and must inure to the exclusive benefit of the widow and children, if any, or next of kin.   Mr. Justice BREWER, in *Hurlbert* v. *City of Topeka*, 34 Fed. 510, referring to the Kansas statute, says it "gives a new right of action—one not existing before ;  an action which is not founded on survivorship ;  an action which takes no account of the wrong done to the decedent, but one which gives to the widow or next of kin damages which have been sustained by reason of the wrongful taking away of the life of the decedent.   It makes no difference whether the injured party was killed instantly or lived months ; whether he suffered lingering pain or not ;  whether or not he was put to any expense for medical attendance and nursing.   None of these matters are to be considered in an action under section 422 ;  and the single question is, How much has the wrongful taking away of his life

injured his widow or next of kin? It is an action to recover damages for the death, and in no sense a survival of an action which accrued to the decedent before his death.'' And to the same effect, see *Martin* v. *Missouri Pac. R. R. Co.*, 58 Kan. 475 (40 Pac. 605) ; *City of Eureka* v. *Merrifield*, 53 Kan. 794 ; *McCarthy* v. *Chicago, etc., R. R. Co.*, 18 Kan, 46 (26 Am. Rep. 742) ; *Missouri Pac. R. R. Co.* v. *Bennett*, 5 Kan. App. 231 (47 Pac. 183).

In Indiana it has been held that, while the statute does not in terms ''revive the common-law right of action for personal injury nor make it survive the death of the injured person,'' it does ''create a new right in favor and for the benefit of the next of kin or heirs of the person whose death has been wrongfully caused :'' *Burns* v. *Grand Rapids R. R. Co.*, 113 Ind. 169 (15 N. E. 230). The questions determined in the adjudged cases on the right of the personal representatives of one whose death was caused by the wrongful act or omission of another to maintain an action for damages against the latter arose under such dissimilar statutes that the decisions afford but little light upon the interpretation of any particular statute at variance with the one under consideration in the given case, and hence it is useless to attempt any further examination of them at this time. However, the following authorities are more or less in point in the present discussion, and in the main tend to support our conclusion as to the proper construction of the statute : Shearman & Redfield, Neg. § 139.; Cooley, Torts, p. 264 ; 2 Thompson, Neg. 1283 ; Tiffany, Death by Wrongful Act, § 73 ; *Brown* v. *Buffalo R. R. Co.*, 22 N. Y. 191 ; *Roach* v. *Consolidated Min. Co.*, 7 Sawy. 224 (7 Fed. Rep. 698) ; *Whitford* v. *Panama R. R. Co.*, 23 N. Y. 465 ; *Murphy* v. *New York R. R. Co.*, 30 Conn. 184 ; *Givens* v. *Kentucky Cent. R. R. Co.*, 89 Ky. 23 (12 S. W. 257) ; *Conners* v.

*Burlington R. R. Co.,* 71 Iowa 490 (60 Am. Rep. 814, 32 N. W. 465) ; *Worden* v. *Humeston R. R. Co.,* 72 Iowa 20 (33 N. W. 629) ; *Nashville R. R. Co.* v. *Prince,* 2 Hiesk. 580.

It is next claimed that the complaint is defective because it does not show that the deceased left surviving him any heirs, legatees, next of kin, or creditors.  Under the provisions of Lord Campbell's Act, and statutes which, like it, give a right of action for the death of a person caused by the wrongful act of another for the · benefit of certain designated relatives, no action can be maintained at all unless the deceased left at least one surviving relative of the class specified, and the complaint must necessarily show that fact : 1 Shearman & Redfield Neg. § 135 ; *Stewart* v. *Terre Haute & I. R. R. Co.* 103 Ind. 44 (2 N. E. 208).  In such case the executor or administrator, in prosecuting the action, is a mere nominal party, who sues for the benefit of the real party in interest ; and such damages as he may recover do not go to the estate of the deceased, nor belong to him in his representative capacity, but to the person for whose benefit the right of action is given by the statute : *Blake* v. *Midland R. R. Co.* 18 Q. B. 93 ; *Bradshaw* v. *Lancashire R. R. Co.* L. R. 10 C. P. 189.  The theory is that those entitled to the benefit of the statute have a pecuniary interest in the life of the deceased, and the recovery is to compensate them for the pecuniary loss they have sustained.  In short, a new right of action is created for the benefit of certain designated persons, and· consequently can be maintained only when the deceased left surviving him some one entitled to its benefit.  Thus, where a statute gives a right of action for the benefit of the widow and next of kin, a husband, not being the next of kin to his wife, is not within its terms, and an action cannot be maintained if the deceased leave a hus-

band only : *Lucas* v. *New York Cent. R.R. Co.* 21 Barb. 245 ;
*Central R. R. Co.* v. *Dixon*, 42 Ga. 327. So, also, where the
statute is for the benefit of the widow and children, no
recovery can be had when the deceased left no widow or
children : *Com.* v. *Boston & Atl. R. R. Co.*, 121 Mass. 36.
But it will be observed that the right of action created
by our statute is not for the benefit of any particular
person, but the damages recovered become assets of the
estate, to be applied by the administrator to the pay-
ment of debts, or distributed as the exigencies of the
estate and the laws governing the distribution of per-
sonal property may direct. Under Lord Campbell's Act,
and similar statutes, the damages recovered belong to the
designated beneficiary, and are measured by the value of
the life taken to the particular person entitled to the ben-
efit of the statute, while under our statute they belong
to the estate, and are coextensive with the value of the
life lost, without regard to its value to any particular per-
son. In the one case the object of the action is to recover
the pecuniary loss sustained by the designated relatives,
and in the other the value of the life lost, measured, as
near as can be, by the earning capacity, thriftiness, and
probable length of life of the deceased, and the conse-
quent amount of probable accumulations during the ex-
pectancy of such life : *Carlson* v. *Oregon Short Line Ry.
Co.*, 21 Or. 450 (28 Pac. 497).

It follows, therefore, that, so far as the right to main-
tain the action is concerned, it is immaterial whether
the deceased left surviving him any relatives or creditors
whatever. The right of action is given by the statute
to the administrator or executor in his representative
capacity, and is in the nature of an asset of the estate.
The heirs, creditors or distributees have no interest in
the recovery on account of any right of action for the
pecuniary injury sustained by them, but only by virtue

of being creditors, or of kinship; and, if the expense of the administration and debts of the deceased equal or exceed the assets, including the amount of the recovery, the next of kin would receive no benefit whatever from the right of action. It is ingeniously argued, however, that an estate of a deceased person can in no way be damaged by his death, and this is probably true if the word "estate" is to be taken in the technical sense of meaning the property left by him. But it is not so used when speaking of the measure of damages for the wrongful death of a person. It is thus used as a convenient term to distinguish the rule as to the measure of damages under our statutes from the one prevailing under statutes similar to Lord Campbell's Act, and in which the recovery is for the benefit of some designated individual.

This brings us to the important question whether the defendant's motion for a nonsuit should have been sustained. It is undisputed that the wires which caused the death of plaintiff's intestate were placed by the defendant in a position where they would probably be exposed to contact by persons working on the bridge, although it knew that it would be necessary to repair the structure from time to time; and it admits and alleges that it is not practicable, in the present knowledge of the science of electricity, to insulate wires so as to make them safe, and not dangerous to persons coming in contact with them, when charged with the high voltage of electricity carried over the wires in question. This is, in our opinion, sufficient to make out a *prima facie* case of negligence, because it tends to support the main ground of recovery relied upon by the plaintiff, *viz.*, that, although the defendant knew it would be necessary from time to time for the railway company to send men on top of the bridge to make needed repairs, it placed its wires to be used in the transmission of such a high

voltage of electricity as inevitably to cause the instant death of any person coming in contact with two of them at the same time in such a position that it was impracticable, if not impossible, to make such repairs without doing so.

It is contended, however, that the deceased was guilty of contributory negligence (1) in going on top of the bridge to work without ascertaining from the defendant company, or someone having knowledge on the subject, whether it would be safe to come in contact with the defendant's wires; and (2) in attempting at the time of the accident to cross from one side of the bridge to the other by walking on the top lateral braces and stepping over the wires, rather than crossing on the end strut brace and under the wires. But both of these contentions proceed on the theory that he was chargeable with knowledge of the fact that the wires were dangerous, and, having voluntarily exposed himself to the risk of contact therewith, must take the consequences of his own conduct. And, indeed, this is the underlying question on this branch of the case. The deceased was unquestionably guilty of such negligence as will preclude a recovery if he is to be charged with knowledge that the defendant's wires, although apparently harmless, were in fact dangerous; for he could have avoided coming in contact with them. But, on the other hand, it cannot be ruled as matter of law that he was negligent in going on the bridge to work or in crossing on the top lateral braces, if the defendant owed to him the duty of exercising reasonable care to prevent injury to him from contact with its wires while at his work. There is evidence tending to show that he acted with due care and caution, and did not heedlessly or recklessly expose himself to contact with the wires. It was only after they had been examined, and their apparent safety ascertained, that

he and his fellow workmen ventured to work at a place where they would probably or necessarily come in contact with the wires; and there is evidence to the effect that the usual and customary way for men employed in the construction or repair of a bridge of the character in question to cross from one top chord to the other is by walking on one of the top lateral braces. Unless, therefore, the case should have been withdrawn from the jury on the ground that the deceased was bound, at his peril, to ascertain whether the wires were in fact dangerous before working at a place on the bridge where he would be likely to come in contact with them, there was no error in denying the motion for nonsuit, and submitting the issue of negligence as respects the defendant and plaintiff to the jury; and we do not think any such doctrine as the one suggested can be maintained either upon reason or authority.

It is not claimed that the deceased had any more knowledge of electricity or its effects than such as is possessed by persons of average intelligence. He knew that there is such a force carried by wires and used in driving cars and lighting streets and houses, and that the wires in question were used for that purpose; but he supposed, as is the common understanding, that the insulating material with which such wires are covered is placed there for the purpose and with the result of making them safe. He had no knowledge of the fact, as this record discloses, that wires are used for the transmission of electricity, which, on account of the high voltage carried, cannot be insulated at any reasonable cost so as to make them safe, and that the insulating material sometimes used thereon affords no protection from injury. Nothing can, therefore, be claimed in this case on account of any special knowledge of electricity or its effect possessed by the deceased; and there is no pretense that

he knew the wires were in fact dangerous, and, as he was not the agent or servant of the defendant company, he was not, in our opinion, chargeable with such knowledge, nor did he assume any risk on account of the wires unless he knew the danger and voluntarily exposed himself to it.   He was not a trespasser or licensee bound to take the premises in the condition in which he found them, but the servant of the railway company, lawfully on the bridge, engaged in an employment which, according to the testimony, necessarily required him to come in contact with the wires of the defendant company. These wires were visible, insulated, and to all appearances perfectly harmless.   There was nothing in their appearance to warn the deceased of the great force being carried over them, or that there was any danger in coming in contact with them.   The danger was a hidden and secret one, and the insulation of the wires deceptive. The familiar rule that one who deliberately goes into a place of known or apparent danger and is injured must take the consequences of his hardihood can have no application here, because there was in fact no apparent danger, but, on the contrary, so far as the deceased—a nonexpert—could ascertain from an examination, the wires were entirely safe, and in perfect condition.   He had a right, therefore, to believe that the place was safe, and to assume that the defendant company had exercised due care and caution to prevent injury to him, and had not placed on the bridge, in such a position that he would likely come in contact with them, wires which it knew to be dangerous.   It was using the bridge by permission of the railway company for the support of wires used in the transmission of a highly dangerous, subtle, and invisible force, and was, therefore, chargeable with the duty of placing and keeping them, as far as practicable, in a condition to avoid injuring the servants of

the railway company while at their work. Its duties and responsibilities in this respect are similar to those of an electric company which, by permission of the owner, places its wires over the roof, or attached to a house or building; and in such case the rule is quite universal that the company is liable to the owner and his servants for an injury received through its negligence by contact with such wires when making needed repairs or improvements to the building, if the injured party is in the exercise of due care and caution at the time.

The question respecting the care required of electric companies under such circumstances first came before the courts in the case of *Clements* v. *Louisiana Electric Light Co.*, ( decided in 1892 ) 44 La. Ann. 692, ( 16 L. R. A. 43, 32 Am. St. Rep. 348, 11 South 51 ). In that case the plaintiff's intestate — a tinsmith engaged to assist in repairing the roof — was killed while at his work by coming in contact with the wires of the defendant company, placed 2 feet 4 inches above the roof. The wires were insulated, and to all appearances safe, but there was a defect in the insulation, which caused his death while he was either attempting to step over or go under the wires, in trying to reach the gutter. The court held, after mature deliberation, that the company was responsible. And although there was involved in the case a failure to comply with a municipal ordinance, requiring electric light companies to have the splices of their wires perfectly insulated, it was considered that this ordinance added nothing to the duty or liability of the company. The court says, in speaking upon this matter, that " it [the wire] passed over a roof to which people in adjoining rooms had access, and where, in the course of time, mechanics must go to make repairs, or laborers to sweep off or clean the roof. It was the duty of the company, independent of any statutory regulation,

to see that their lines were safe for those who, by their occupation, were brought in close proximity to them." And in answer to the objection that deceased was guilty of contributory negligence, it said: "The deceased, Clements, was lawfully on the gallery roof. He was engaged in a service that necessarily required him to run the risk of coming in contact with the defendant's wires, either by stepping over them or going under them. It is probable that the latter mode was the most convenient, and there is no evidence that in doing so he incurred any greater risk. The wires were visible, and to all appearances were safe. The great force that was being carried over the wire gave no evidence of its existence. There was no means for a man of ordinary education to distinguish whether the wire was dead or alive. It had all the appearance of having been properly insulated. From this fact there was an invitation or inducement held out to Clements to risk the consequences of contact. He had a right to believe it was safe, and that the company had complied with its duties specified by law. He was required to look for patent, and not latent, defects. Had he known of the defective insulation and put himself in contact with the wire he would have assumed the risk. The defect was hidden, and the insulation wrapping was deceptive. It is certain, had it been properly wrapped, Clements would not have been killed. His death is conclusive proof of the defect of insulation and the negligence of the defendant. He exercised reasonable care in going under the wire in the performance of his duty, as he had a right to believe, from external appearances, that the wire was safe. His action was such as not to tend to expose himself directly to the danger which resulted in the injury. In fact, there was no apparent danger."

So, also, in *Giraudi* v. *Electric Improv. Co.*, 107 Cal.

120 ( 28 L. R. A. 596, 48 Am. St. Rep. 114, 40 Pac. 108 ),
the plaintiff was sent on top of a building by the owner
to adjust a sign which was about to be blown down by
the wind, and, coming in contact with an electric light
wire, placed along and near the roof, was injured, and it
was held that the failure of defendant to place its wires
a sufficient distance above the roof to enable persons
lawfully thereon to pass under them was sufficient proof
of negligence to justify the verdict, and that plaintiff
was not guilty of contributory negligence by going on
the roof. The court say : '' Defendant was using a dan-
gerous force, and one not generally understood. It was
required to use very great care to prevent injury to per-
son or property. It would have been comparatively
inexpensive to raise the wires so high above the roof
that those having occasion to go there would not come
in contact with them. Not to do so was sufficient proof
of negligence to justify the verdict. If there was any
excuse for not so locating the wires, it is on the claim
that they were so covered that there was no danger in
coming in contact with them. The accident itself proves
that this was not sufficient, *res ipsa loquitur*. The point
most insisted upon here is that plaintiff was guilty of
contributory negligence ; that he knew, or ought to have
known, of the location of the wires, and should have
taken care to avoid them. It is not a case where the
doctrine of negligent ignorance can apply. Plaintiff
owed defendant no duty, and no part of his employment
required him to know, or gave him opportunity to know.
Unless it can be held that he did in fact know, there was
no evidence which even tended to show negligence on
his part.'' And again, in *Ennis* v. *Gray*, 87 Hun. 355,
the plaintiff, a roofer, employed by the owner of a build-
ing, was injured while at his work by coming in contact
with an electric light wire of the defendant, which was

attached to the building, and which the evidence tended
to show was placed without proper safeguards and
improperly insulated, and the court held that the issue
as to the defendant's negligence and the contributory
negligence of the plaintiff was for the jury.   In this case
the defendant tried to escape liability by claiming that
there was no contractual relation or other privity between
it and the plaintiff which required it to protect him while
at work for the owner of the building, and while on his
premises, and that as to him the construction and main-
tenance of electric apparatus were *res inter alios*.   But
the court held that the defendant was engaged in the
business of supplying electricity for lighting purposes,
and, considering the high voltage which it was necessary
to carry over its wires, the business was of a character
highly dangerous and likely to result in injury to others
unless conducted with care and skill.; and therefore, out-
side of any contractual relation, the law imposed the
duty upon defendant of using the necessary skill and
prudence to prevent injury to persons coming in contact
with its wires, not only as regards the public generally,
but also with respect to any individual engaged in a
lawful occupation in a place where he was entitled to be.

So also in *McLaughlin* v. *Louisville Electric Light Co.,*
18 Ky. L. Rep. 693· (34 L. R. A. 812, 37 S. W. 851), a
person engaged in painting a building was injured by
coming in contact with an imperfectly insulated electric
wire on the side of the building, while climbing out of a
window upon the cornice, and in an action against the
electric company to recover damages for the injury, it
was held that the defendant was bound to exercise the
utmost care to keep the insulation of its wires perfect at
a place where people had a right to go for work, business,
or pleasure, although very great care may be sufficient
for wires at other places; that an apparently properly

insulated wire is an invitation or inducement to such person to risk the consequence of contact with it; that the fact that the insulation of such wires is expensive or inconvenient is no excuse for failure to make such insulation perfect at places where people have a right to go; and that the plaintiff in the action was not guilty of contributory negligence in coming in contact with the wires unless in so doing he failed to exercise the degree of care which an ordinarily careful and prudent person usually exercises under similar circumstances, and the question whether he exercised such care was for the jury and not the court. A like principle was applied in *Illingsworth* v. *Boston Electric Light Co.*, 161 Mass. 583 (25 L. R. A. 552, 37 N. E. 778). The plaintiff was employed in the fire alarm system of the City of Boston. The city used for the lines of its system structures erected by the defendant electric company for the support of its electric wires. While the plaintiff was in the performance of his duties and descending one of such structures, the pliers in his belt caught in a wire belonging to the defendant, and in reaching around to clear them he received injury by the contact of his hand with a wire of the defendant not properly insulated; and it was held, in an action against the company for damages, that the defendant's negligence in leaving the joints of its wires without insulation at such place, and the question whether the plaintiff was in the exercise of due care, should have been submitted to the jury. So, also, in *Griffin* v. *United Electric Light Co.*, 164 Mass. 492 (32 L. R. A. 400, 49 Am. St. Rep. 477, 41 N. E. 675), a tinsmith, while engaged in placing an iron conductor on a building, was injured by receiving a shock from an electric light wire running along the side of the building, about 12 feet from the ground, by reason of the conductor which he was handling coming in contact with a place on the wire

where the insulating material had been worn off, and it was held that the question of defendant's negligence and of due care on the part of plaintiff were for the jury, and that it could not be said as a matter of law that the condition of the wire was so apparent that the plaintiff must or ought to have seen it, although the accident happened in the forenoon; and that, while an expert might consider it dangerous to touch any wire unless he knew it was a harmless one, no such degree of care could be required of the plaintiff, who was not an expert, but that the question of his want of care was for the jury.

Applying the doctrine of these cases, and the underlying principles by which they are controlled, to the case in hand, it is clear that no error was committed in overruling the motion for nonsuit. It is true that in the cases referred to the actions were grounded on negligence in using improperly insulated wires, but in each instance the judgment of the court proceeds on the theory that it is a want of due care for a company handling and transmitting the highly dangerous force of electricity to use a wire known, or which reasonably ought to have been known, to be dangerous, at a place where others are lawfully entitled to be; and it is assumed in each instance that, but for the insufficient insulation, the wires would have been safe. The same principle governs here. Although the wires of the defendant company were insulated, it is admitted that such insulation was no protection whatever to persons coming in contact with them, and hence the negligence of the defendant is equally as great, if not greater, than if the danger had been from insufficient or want of insulation. The apparently perfect insulation was calculated to deceive, and to cause one unfamiliar with the facts to suppose the wires safe. It acted as an invitation to persons at work in and among the wires to risk the consequences of contact

therewith.   And such was the effect in this case.   But for
the insulation, and the belief of safety caused thereby, it is
not at all probable that the deceased would have exposed
himself to the risk of a contact with the wires in ques-
tion.   The defendant, however, knew that the insulation
afforded no protection, and yet, with knowledge of that
fact, put its wires in a place where the servants of the
railway company might come in contact with them while
in the performance of their duties, and without giving
any warning or notice of the danger whatever.   Under
such circumstances a jury would certainly be justified
in finding that it did not exercise due care and caution
in so doing.   Electric companies, of course, are not
bound to have perfect apparatus or perfect construction,
but they are required to exercise a degree of care and
prudence in the construction and maintenance of their
wires commensurate with the danger ;  and where their
wires are designed to carry a strong and powerful cur-
rent of electricity, so that persons coming in contact with
them are certain to be seriously injured, if not killed,
the law imposes upon the company the duty of exercis-
ing the utmost care and prudence to prevent such injury;
and whether such care has been exercised in a given case
is ordinarily for the jury :  Croswell, Electricity, § 234.

The cases cited and relied upon by the defendant are
not in point in this contention.   In *Beck* v. *Vancouver Ry.
Co.*, 25 Or. 32 (34 Pac. 753) ;  *Salem-Bedford Stone Co.* v.
*Hobbs*, 11 Ind. App. 27 (38 N. E. 538) ;  *Salem-Bedford
Stone Co.* v. *O'Brien*, 12 Ind. App. 217 (40 N. E. 430),
and *Flood* v. *Western U. Teleg. Co.*, 131 N. Y. 603 (30 N.
E. 196) — the danger was open and visible, and could
have been ascertained by the complainant if he had exer-
cised his faculties.   In *Hector* v. *Boston Electric Light Co.*,
161 Mass. 558 (25 L. R. A. 554, 37 N. E. 773), the facts
are that a lineman of a telephone and telegraph com-

pany was sent to attach a wire to a standard owned by the defendant on the roof of a building. Instead of entering this building, and going out on the roof, he went up on a building some distance away, passed over the several intervening structures until he came to the building adjoining the one on which the standard was placed. While stooping down to see how he could get from this building to the place of his destination, he came in contact with the wires of the defendant company, and was injured by reason of the insulation being worn off. The case was decided in favor of the defendant, on the ground that it owed no duty to the plaintiff to maintain an effective insulation at the place where he was injured, where he was not sent to work, and where he had no right to be. The same is true of the case of the boy who was killed by coming in contact with the wire of an electric company while searching on top of a building for a lost ball : *Sullivan* v. *Boston & Atl. R. R. Co.*, 156 Mass. 378 (31 N. E. 128). In both cases the injured party was a trespasser, and at a place where he had no right to be, and where the company was under no obligation to protect him from injury. But in the case at bar the deceased was rightfully at the place where he was injured. In *McMullan* v. *Edison Electric Co.* (City Ct. Brooklyn) 13 Misc. 392 (34 N. Y. Supp. 248), the defendant company had disconnected its service wires, carrying a low current of electricity, which could not cause death or great bodily harm, from the distributing wires in the cellar, 8 feet above the ground, in order that the owner might make certain repairs, but failed to " tape " the ends of the wires, and it was held that it was not liable for an injury to a workman while engaged in making such repairs, because no reasonable person would, under the circumstances, have anticipated " that any person would have entered this

cellar, mounted upon a box, and, after seeing these wires, taken hold of at least two of them at the same time, in such a manner as to make a short circuit, or bring the two wires in contact with his hand near the same point, and thus burn his hand.'' In *Burk* v. *Edison General Electric Co.* 89 Hun. 498 (35 N. Y. Supp. 313) the evidence shows that the deceased deliberately chose a way of known danger to go from one part of a cellar to another, when a perfectly safe way was open to him, and the court held that he must take the consequences of his own hardihood.

It only remains to notice briefly the assignments of error based upon the giving and refusal of instructions by the trial court. The defendant requested in writing some fourteen different instructions, which were refused, except as given in substance in the general charge. All of these, except one, present different phases of the questions already considered, and therefore require no further notice. By the eighth request the court was asked to charge the jury that, if they should find for the plaintiff, they could not estimate nor give exemplary or vindictive damages, nor any damages as a *solatium* for the grief or anguish of the surviving relatives, or the pain or suffering of the deceased. And while this instruction embodies a correct principle of law, and might with propriety have been given (*Carlson* v. *Oregon Short Line Ry. Co.*, 21 Or. 450 (28 Pac. 497), its refusal was not reversible error. Neither exemplary damages nor damages for the suffering of the deceased or any of his relatives were asked in the complaint, nor, so far as the record indicates, claimed at the trial. The allegations of the complaint and the proof were confined to the earning capacity, habits, and probable length of life of the deceased, and no instructions were given under which the jury could have understood that they had a right to con-

sider any other matter in arriving at the amount of the verdict. By the instruction as given they were told, in effect, in assessing damages, if they found in favor of the plaintiff, to consider the earning capacity, habits, and probable length of life of the deceased, and thus determine what would probably have been his accumulations if he had lived the ordinary course of his life ; and no question is made as to the soundness of this rule. The entire charge of the court as given seems to have been separated into paragraphs, in some instances without special reference to the context, and objections made and exceptions saved to the giving of each ; and while the charge, which was given orally, is perhaps open to some criticism on account of the verbal inaccuracy of the language used, to which the attention of the trial court was not specially called at the time, it however, in our opinion, exhibits no reversible error, but, when taken as a whole, fairly and accurately presents the law as applicable to the facts of this case.

The definition of '' negligence '' as given is not open to the criticism made, nor did the court withdraw the question of plaintiff's intestate's contributory negligence from the jury, but told them expressly that what he had said in regard to the defendant's liability must be taken with the proviso that the plaintiff's intestate did not himself contribute by his own negligence to the injury from which he died, and then proceeded with the charge in detail on that phase of the case. The statement that the words '' care '' and '' diligence,'' when used in reference to the duty of the defendant, are not absolute, but relative, terms ; —'' that, when the danger is great, the care and vigilance to escape the consequence of danger must be proportionately great. In matters of this sort, where people are dealing with electricity ( one of the most

33 OR.—31.

subtle, powerful, and wonderful agencies known to man ; an agency that is very destructive to human life, even when carefully and properly handled and treated ),— I instruct you that in such a case as this due care would be the highest care and vigilance of which a man is capable, and which the condition of science makes known at the time.    And this is the degree of care which was demanded of the company : to so conduct itself in regard to the wires on that bridge as that the diligence and care should be proportionate to the danger which there existed,"— is but, in effect, an application to the case in hand of the rule that the care demanded of electric companies must be commensurate with the danger, and that, where their wires are carrying a highly dangerous current of electricity, as is admitted to have been carried over the wires which caused the death of plaintiff's intestate, the law imposes upon the company the utmost degree of care in their construction, inspection, and repair, so as to keep them harmless at places where persons are liable to come in contact with them : Crosswell, Electricity, § 234 ; *Haynes* v. *Raleigh Gas Co.*, 114 N. C. 203 ( 26 L. R. A. 810, 41 Am. St. Rep. 786, 19 S. E. 344); *City Electric R. Co.* v. *Conery*, 61 Ark. 381 ( 31 L. R. A. 570, 54 Am. St. Rep. 262, 33 S. W. 426); *Giraudi* v. *Electric Improv. Co.*, 107 Cal. 120 ( 28 L. R. A. 596, 48 Am. St. Rep. 114, 40 Pac. 108 ) and authorities heretofore cited.

The questions in this case are important, and many of them of first impression in this state, and therefore we have given to the case that consideration which its merits deserve ; but, finding no error in the record, the judgment must be affirmed, and it is so ordered.

AFFIRMED.

ON MOTION TO RETAX COSTS.

MR. JUSTICE BEAN, delivered the opinion.

This is an appeal from a judgment of the court below in the matter of the retaxation of costs and disbursements in the above-entitled action, and the only question presented is whether a party who is entitled to his costs may recover as disbursements the mileage and per diem of a material witness, residing in the state, who attended the trial at his request, but without having been served with a subpœna. This question was decided in the affirmative in *Crawford* v. *Abraham*, 2 Or. 163, and again in *Sugar Pine Lumber Co.* v. *Garrett*, 28 Or. 168 (42 Pac. 129) ; and, as the experience of more than thirty years has shown the rule to be a wholesome one, we do not feel authorized to disturb it at this time, although its soundness may perhaps be open to some question.

AFFIRMED.