## MONONGAHELA WEST PENN PUBLIC SERVICE CO. v. ALBEY.

Circuit Court of Appeals, Sixth Circuit.
February 15, 1929.

No. 5069.

Carl Smith, of Steubenville, Ohio, and Lawrence R. Pugh, of Columbus, Ohio (Lewis, Smith & Francis, of Steubenville, Ohio, and Pugh & Pugh, of Columbus, Ohio, on the brief), for plaintiff in error.

John D. Gardner and Ralph B. Cohen, both of Steubenville, Ohio, for defendant in error.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

HICKS, Circuit Judge. This is an action for damages for personal injuries. The petition alleged that plaintiff, an employé of the Wheeling Steel Corporation as an electric welder, was temporarily engaged in building a shed on his employer's premises over which defendant, without notice or warning, maintained too close to plaintiff and his fellow workmen an unguarded high-tension wire carrying a heavy voltage of electricity, as a result whereof plaintiff was seriously injured by an electric current conveyed from said wire into his body by a ladder which, while plaintiff was using it, came into contact with the wire.

Defendant entered (1) a general denial, and for further defense the defendant entered the plea of (2) assumption of risk and (3) contributory negligence.

Plaintiff had verdict and judgment, and defendant brought a writ of error and assigned errors. The principal assignments are: (1) That there should have been a directed verdict for defendant, and (2) that the court took from the jury the defense of assumption of risk.

The physical situation was this: Plaintiff in error furnished electric power to the steel company through six wires in two series of three each, one series over the other, carried on wooden poles and coming into the plant to a transformer at a substation. The top series were insulated and the lower ones were bare, but these wires carried 25,000 volts of electricity, and insulation was said to be insufficient protection from contact. The substation was fenced and carried a sign which read "22,000 VOLTS, DANGEROUS." Between it and the first pole to the east and under the wires was a small shanty where defendant in error worked. The steel corporation desired to erect a larger building for the welders, and to do this it became necessary to remove the shanty and this pole. The new building, entirely of steel, was about 56 feet long by 15 feet wide, running east and west, and was of shed-like construction built against the machine shop. The roof sloped from the machine shop and was about 11 feet from the ground at its outer edge. During its erection plaintiff in error, at the re-

quest of the steel company, on February 28, 1925, removed the old pole and erected another of the same height (35 feet) about 15 feet eastwardly and against the east end of the new shed and attached the six wires thereto on cross-arms at the same height from the ground as they were originally. The plaintiff in error had a supply of longer poles, and the wires might have been still further elevated. By the new arrangement the wires were actually brought about 10 inches closer to the roof of the new shed than they were originally. The roof of the new building was higher than that of the old by something like 3 feet, and the wires ran east and west with the roof, sloping from the cross-arms on the pole at the east of the building to the pole at the transformer. The elevation of the wires at the east pole was 25 feet 11 inches and at the transformer 14 feet 7 inches. It was variously testified to that at the point where defendant in error was injured the lower wires were from 40½ to 62 inches from the roof and 17 to 18 feet from the ground. The location of the wires at the transformer was not disturbed. To have done so would have necessitated an entire rearrangement at the substation. This whole electrical plant and equipment on the steel company's property was owned, operated, and controlled by plaintiff in error. The changes indicated were made by plaintiff in error at the request of the steel company. The witness Zurick, then division manager for plaintiff in error, at the request of the steel company, went to the plant with his foreman, one Roberts, and instructed Roberts to do the work. He testified: "I told him to 'get the pole out of there and get the wires up in the clear.'"

He further testified that with reference to high-tension wires this expression: "'Get the wires up in the clear' means to get it out of the reach of any person so that they may not come in contact with it, so that if a man happened to have a saw or bar or hammer that he would not hit that if he should happen to be on a roof somewhere working. We figure around 10 feet for a clearance above a roof. I knew nothing whatever about these wires after the job was ordered done. I didn't know the condition of them whatever after that. If it should develop that these wires were only 4 or 5 feet above the west end of this shanty which is a steel building, built on a steel frame and steel metal on the outside, I would condemn the work with reference to its being proper or safe construction. I mean by condemn that if I saw a piece of construction of that kind with high-

tension wires within 4 or 5 feet of any building where there was any work on it, I would either stop the work until those wires were raised or vice versa. In other words, it absolutely would not be proper or safe construction."

At the time the changes were made, the new building had not been completed. Roberts testified that he knew that the building was yet in process of construction, that the roof was not on, and that it would be necessary to put the roof on and for men to go upon the building, and while the roof was being put on the plaintiff in error at the request of the steel company shut off the power.

From the above recapitulation of the material evidence, it is clear that the question of negligence or due care upon plaintiff in error's part was one of fact for the jury.

In Reynolds v. Iowa Southern Utilities Co., 21 F.(2d) 958 (C. C. A. 8), at page 960, it is said: "As stated in Joyce on Electric Law, § 445: 'A company maintaining electrical wires, over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have the right to go, either for work, business, or pleasure, to prevent injury.'"

In Perham v. Portland Electric Co., 33 Or. 451, at page 478, 53 P. 14, 23 (40 L. R. A. 799, 72 Am. St. Rep. 730) it is said: "Electric companies, of course, are not bound to have perfect apparatus or perfect construction, but they are required to exercise a degree of care and prudence in the construction and maintenance of their wires commensurate with the danger; and where their wires are designed to carry a strong and powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost care and prudence to prevent such injury; and whether such care has been exercised in a given case is ordinarily for the jury. Croswell, Electricity, § 234."

In Daltry v. Electric Light, etc., Co., 208 Pa. 403, 409, 57 A. 833, 835, it is said: "Electricity when of sufficient voltage for lighting purposes is well known by electricians and others familiar with its properties to be most dangerous and likely to cause death to those who come in contact with its current. Those who deal with it or supply it to the public are therefore required to recognize this fact and to exercise care commensu-

rate with the danger. A party responsible for an injury by reason of a failure to observe such care is guilty of negligence. As said in Fitzgerald v. Edison Electric Co., 200 Pa. 540 [50 A. 161, 86 Am. St. Rep. 732]: 'The company, however, which uses such a dangerous agent is bound not only to know the extent of the danger, but to use the very highest degree of care practicable to avoid injury to every one who may be lawfully in proximity to its wires and liable to come accidently or otherwise in contact with them.'"

Also in Giraudi v. Electric Co., 107 Cal. 120, 40 P. 108, 28 L. R. A. 596, 48 Am. St. Rep. 114, it is stated: "If an electric company maintains a dangerous wire over the roof of a building where people are likely to go, it must raise the wire to an altitude where contact is difficult, or it must by insulation or other devices reduce the danger from contact."

See, also, Memphis Cons. Gas & Elec. Co. v. Letson, 135 F. 969, 972 (C. C. A. 6); Bristol Gas & Elec. Co. v. Deckard, 10 F. (2d) 66, 67 (C. C. A. 6); Curcuru v. Peninsular Elec. Lt. Co., 258 F. 785, 790 (C. C. A. 6); Knowlton v. Light Co., 117 Iowa, 451, 455, 90 N. W. 818; Thomas v. Elec. Co., 54 W. Va. 395, 400, 46 S. E. 217.

It is contended that the court erred in withdrawing from the jury the defense of assumption of risk, as embodied in the maxim, "volenti non fit injuria." The indiscriminate use of the terms "assumption of risk" and "volenti non fit injuria," without reference to their technical meaning or proper setting, has given rise to irreconcilable confusion. However, we apprehend that as a general proposition "assumption of risk" is applicable to cases involving contractual relationship, and while "volenti non fit injuria" may be applied in such cases, yet its appropriate and more general use is found as a defense in the broader field of negligence actions generally. O'Maley v. South Boston Gas Light Co., 158 Mass. 135, 32 N. E. 1119, 47 L. R. A. 161. Its modern interpretation is that "one who, knowing and appreciating a danger, voluntarily assumes the risk of it, has no just cause of complaint against another who is primarily responsible for the existence of the danger." A shorter and more expressive definition probably is, that one who willingly encounters a known danger cannot complain. In this view the court correctly instructed the jury to disregard the defense. It was applicable to no proven fact. Albey knew of the existence of the wires and supposed they were electric wires and as a matter of common knowledge they were dangerous. Monongahela West Penn Public Service Co. v. McNutt, 13 F. (2d) 846, 847 (C. C. A. 6). The west end of the shed had not been closed, and the foreman, Kahn, had told defendant in error to put up a two by four; that is, to attach it to a channel iron by bolts so that the siding could be nailed to it. To do this it was necessary to bore holes through the two by four to fit the holes in the channel iron, and to get the proper measurements it was necessary to use a ladder. He found a ladder upon the premises which looked like a wooden ladder and which he thought was a wooden ladder. When he picked it up, he did not notice steel on it and did not know that it was a conductor of electricity. He carried it on his shoulder, and, intent upon his work and unconscious of danger, set it up against the shed. On starting up he discovered that the ladder was too far from the channel iron. He came down and without looking up pushed the ladder in toward the building. The result was that the upper end of it moved upward and backward until it came in contact with one of the highly charged wires, whereupon the electricity escaped through the ladder, entered plaintiff's body, and he was seriously injured. This ladder was built of wood, except that it had steel cleats in the shape of angle irons attached to the upper and lower side of each rung and the other angle to the inside of the upright; the ends on the uprights coming together, and the cleats being riveted through the rungs by metal rivets. This metal thus formed a conductor of electricity for the length of the ladder, but was not noticed by defendant in error, and the determinative evidence is that, while the steel might have been observed by inspection, it was not at all open to observation that the ladder was a dangerous instrumentality. It became a conductor by reason of the rivets through the rungs which connected the steel strips or cleats. The only way to ascertain whether the rivets went entirely through the rungs, and thus completed the connection, was to either use a magnet or to do what was eventually done, to make the examination by breaking up the ladder. Neither "volenti non fit injuria" or "assumption of risk," if applicable here, require defendant in error to make a critical examination of the ladder. The maxim, "volenti non fit injuria," could only defeat defendant in error when he knew or was bound to know the risk and voluntarily exposed himself to it. Illingsworth v. Boston Elec. Light Co., 161 Mass. 583, 588, 37 N. E. 778, 25 L. R. A. 552; Olm v. N. Y. & Queens El. & P. Co., 188 App. Div. 19, 176 N. Y. S. 370, 373;

Southern Pac. Co. v. Johnson (C. C. A.) 69 F. 559, 573. The test of the "assumption of risk" theory, even if applicable here, is not whether defendant in error exercised due care in the inspection of the ladder, but rather whether its dangerous condition was known or plainly observable. Choctaw O. & G. R. Co. v. McDade, 191 U. S. 68, 24 S. Ct. 24, 48 L. Ed. 96. And the same test applies to the insistence that contributory negligence conclusively appeared.

Upon the whole we conclude that the verdict had substantial support in the testimony. ■ It is assigned as error that the court admitted certain testimony objected to at the time, but this testimony was withdrawn from the jury by specific instructions and plaintiff in error cannot now complain. Buckeye Cotton Oil Co. v. Sloan, 250 F. 712, 723 (C. C. A. 6). The other assignments of error, not being of sufficient importance for discussion, are overruled.

The result is, the judgment is affirmed.